Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/27/2020 09:07 AM CDT

In re Interest of Jeremy U. et al.,
children under 18 years of age.
State of Nebraska, appellant and cross-appellee,
v. Tiffany G., appellee and cross-appellant,
and Brandon M., appellee.

___ N.W.2d ___

Filed January 3, 2020.    No. S-19-215.

1. **Statutes: Appeal and Error.** Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.
2. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.
3. **Jurisdiction: Words and Phrases.** Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.
4. **Juvenile Courts: Parental Rights: Notice.** The factual allegations of a petition seeking to adjudicate a child must give a parent notice of the bases for seeking to prove that the child is within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016).
5. **Juvenile Courts: Proof.** The State has the burden to prove the allegations of a petition seeking to adjudicate a child by a "preponderance of the evidence," which is the equivalent of the greater weight of the evidence.
6. **Evidence: Words and Phrases.** The greater weight of the evidence means evidence sufficient to make a claim more likely true than not true.
7. **Juvenile Courts: Minors.** The State's right in juvenile proceedings is derived from its parens patriae interest, and it is pursuant to that interest that the State has enacted the Nebraska Juvenile Code.
8. ____: ____. The State has a right to protect the welfare of its resident children, which is a governmental interest of great importance.

9. ____: ____. The purpose of the adjudication phase of a juvenile proceeding is to protect the interests of the child.

10. **Statutes.** Statutory language is to be given its plain and ordinary meaning.

11. **Statutes: Legislature: Intent.** In discerning the meaning of a statute, a court should determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.

12. **Statutes: Juvenile Courts: Minors: Appeal and Error.** An appellate court liberally construes statutes within the Nebraska Juvenile Code to accomplish its purpose of serving the best interests of the juveniles who fall within it.

13. **Juvenile Courts: Parental Rights: Words and Phrases.** "Parental" as used in the phrase "lacks proper parental care" in Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) describes the type and nature of care rather than the relationship of the person providing it.

14. ____: ____: ____. "Proper parental care" under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) includes providing a home, support, subsistence, education, and other care necessary for the health, morals, and well-being of the child. It commands special care for the children in special need because of mental condition. It commands that the child not be placed in situations dangerous to life or limb, and not be permitted to engage in activities injurious to his or her health or morals.

15. **Statutes.** A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless.

16. **Juvenile Courts: Jurisdiction: Proof.** While the State need not prove that the child has actually suffered physical harm to assert jurisdiction under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016), Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm.

Appeal from the Separate Juvenile Court of Douglas County: Chad M. Brown, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Donald W. Kleine, Douglas County Attorney, Anthony M. Hernandez, and Alexander T. Kelly, Senior Certified Law Student, for appellant.

Reginald Young, of Young & Young, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## I. INTRODUCTION

After a newborn reportedly tested positive for methamphetamine, the State sought to adjudicate the newborn—who had been in a hospital with his mother—and his two siblings—who lived with and received appropriate care from their grandmother—solely on the basis that the children "lack[ed] proper parental care."[1] The juvenile court declined to adjudicate them, finding that the State failed to prove they were at risk of harm. On appeal, our decision regarding the older siblings is driven by the plain meaning of the statute on the State's chosen ground, its choice not to allege any other ground, and its failure to establish that the mother exposed or threatened to expose them to her drug usage. We affirm the juvenile court's decision as to them. But because the evidence demonstrated that the newborn lacked proper parental care due to his mother's fault or habits, we reverse the court's decision as to him and remand the cause for further proceedings.

## II. BACKGROUND

### 1. Adjudication Petitions

Tiffany G. is the biological mother of Savannah M., born in March 2015; Ashton M., born in April 2016; and Jeremy U., born in October 2018. Brandon M. is the biological father of Savannah. The fathers of Ashton and Jeremy are not involved in these proceedings.

Four days after Jeremy's birth, the State filed a juvenile petition seeking to adjudicate the children under § 43-247(3)(a) on only one ground: due to a lack of proper parental care by reason of Tiffany's fault or habits. Within the scope of that ground, the petition alleged that the children were at risk for

---

[1] See Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016).

harm due to Tiffany's use of alcohol or controlled substances, her failure to provide proper parental care, and her failure to provide stable housing.

On the same day, the State filed two motions concerning custody. One was an ex parte motion for immediate custody of Jeremy. The other was a motion for protective custody of Savannah and Ashton. Both motions sought an order placing the temporary care and custody of the children with the Nebraska Department of Health and Human Services (DHHS) with placement to exclude Tiffany's home. The court granted the State's motion with respect to Jeremy, stating that Jeremy's urine drug screen was positive for methamphetamine and that Tiffany admitted recent use of the drug. The court later ordered that Savannah and Ashton be placed in the temporary custody of DHHS, with placement to exclude Tiffany's home.

In January 2019, the State filed a supplemental petition. It alleged that Savannah lacked proper care by reason of the fault or habits of Brandon. Specifically, it alleged that Brandon failed to provide proper parental care and safe housing, which put Savannah at risk for harm. The court granted the State's motion for an ex parte order for immediate temporary custody of Savannah.

## 2. Adjudication Hearing

The court heard testimony from two witnesses during an adjudication hearing. Neither parent testified.

Kelci Christensen, a child and family services specialist with DHHS until November 2018, conducted an initial assessment for the family. The intake that she received informed her that Tiffany was in the hospital for Jeremy's birth and that there were allegations Tiffany tested positive for methamphetamine. When Christensen met with Tiffany, Tiffany reported she was "couch surfing at the time, didn't have a stable place to live."

Christensen testified that Tiffany admitted using methamphetamine almost daily for the past 13 years. She also used

marijuana "pretty often," but not as frequently as methamphetamine. According to Christensen, Tiffany said she used methamphetamine within the week of Jeremy's birth and she believed Jeremy would test positive for the drug. Tiffany had sought treatment, but had not successfully completed it.

Christensen testified that the effects of methamphetamine make it more difficult for an individual to properly "parent" his or her children. Parents under the influence of methamphetamine often have difficulty making appropriate decisions. Christensen would categorize children under age 3—which these children were—as vulnerable children in their parent's custody if the parent was under the influence of methamphetamine. She testified that a child in the presence of a parent who was under the influence of methamphetamine would be unsafe.

When Christensen conducted her investigation, Tiffany had legal custody of the children, but not physical custody. Savannah and Ashton were residing with Tiffany's mother, Tina G. Christensen testified that Savannah and Ashton had appropriate clothing, had a bedroom to sleep in at Tina's house, and appeared to be in good health. Jeremy was initially placed with Carolina O., a friend of the family, but he was eventually placed with Tina.

While at the hospital, Christensen drafted a safety plan. As part of the safety plan, Tiffany agreed to participate in domestic violence classes and to comply with any recommendations of a drug and alcohol evaluation. Tiffany arranged to have someone else care for her children. According to the plan, Tina would care for Savannah and Ashton and Jeremy would stay with Carolina. Tiffany, Tina, and Carolina all signed the safety plan. Christensen observed Tiffany sign a temporary delegation of parental authority form as to Savannah and Ashton and one regarding Jeremy. According to Christensen, a parent's signing a temporary delegation of parental authority form shows that the parent is "willing to at least try to keep that child safe and out of risk of harm." Neither the safety plan nor the delegation forms are in our record.

Despite the execution of those forms, the children were removed and placed in the temporary care and custody of DHHS. Christensen did not agree with the removal of the children, because DHHS' policy is to first offer a parent a safety plan and provide an opportunity to appropriately care for a child without court involvement. Specifically, she did not agree with Jeremy's removal because Tiffany was not given a chance to enact any of the measures agreed upon in the safety plan.

According to Christensen, DHHS determined that the allegations of the petition were unfounded. She explained that it was not child abuse or neglect for Tiffany to realize that she "could not care for her children physically because of her drug use and plac[e] them with appropriate parents who could make sure that . . . her children received everything that they needed in order to be happy and healthy." And due to the safety plan, Christensen did not believe the children were at risk for immediate harm. Christensen acknowledged that the temporary delegation of parental powers could be revoked by a parent at any time. But she testified that as long as a parent who is constantly under the influence of methamphetamine has continued to leave the child with an appropriate caregiver, that is not a risk for harm.

Maranda Buckley, an employee of PromiseShip, provided testimony relevant to Brandon. Her duties with PromiseShip included meeting with families, assessing ongoing safety risks, and "looking out for the best interests of the children and their well-being." Buckley opined that Savannah would be at risk for harm in Brandon's custody due to his not having a house or income and his inability to meet Savannah's needs. Brandon was in jail when Buckley met with him on January 7, 2019, but he was released on January 16. Buckley had not spoken with Brandon since his release, testifying that he "ha[d] not been engaging" and would not return her telephone calls or respond to her text messages. According to Buckley, Brandon had not attempted to visit or call Savannah.

### 3. Juvenile Court's Order

The court found that the State proved some of the allegations of the petition and supplemental petition. It found to be true that Tiffany failed to provide the juveniles with proper parental care, support, supervision, and/or protection and that she failed to provide them with safe, stable housing. According to the order, the evidence showed that at the time of removal, Savannah and Ashton had not been living with Tiffany and that Tiffany "had not seen them for at least two years." With respect to Brandon, the court found that the State proved he failed to provide Savannah with proper parental care and safe housing.

The court dismissed the petition due to insufficient evidence that the juveniles were at risk for harm due to Tiffany's use of controlled substances, failure to provide proper parental care, and failure to provide stable housing. The court likewise dismissed the allegation of the supplemental petition that Brandon's failures put Savannah at risk for harm.

The court found that *In re Interest of Justine J. et al.*[2] was "controlling." It determined that the State had not shown any risk of harm to Savannah and Ashton, noting that Christensen did not believe the children were at risk of harm. With regard to Jeremy, the court stated that Christensen's testimony "showed that there was not a risk of harm . . . because [Tiffany] had made a rational decision to find a suitable care taker due to her continued methamphetamine addiction." According to the court, Tiffany "had exhibited this rational thinking on at least three occasions, coinciding with her three children." The court recognized that Christensen testified the children would be at a risk of harm if in Tiffany's physical custody, but not at a risk in her legal custody. Due to insufficient evidence to prove risk of harm, the court dismissed the matter and terminated the court's jurisdiction.

The State timely appealed, and Tiffany filed a cross-appeal.

---

[2] *In re Interest of Justine J. et al.*, 286 Neb. 250, 835 N.W.2d 674 (2013).

## III. ASSIGNMENTS OF ERROR

The State assigns that the juvenile court erred (1) when it found that Tiffany's use of controlled substances did not place the juveniles at risk of harm due to insufficient evidence and (2) when it found that Brandon did not fail to provide Savannah with safe, stable housing.

On cross-appeal, Tiffany assigns that the juvenile court erred when it found that (1) jurisdiction of the court was proper, (2) she had not seen Savannah and Ashton for 2 years, and (3) the allegations that she failed to provide her children with proper parental care and had failed to provide her children with safe, stable housing due to her fault or habits were true by a preponderance of the evidence.

## IV. STANDARD OF REVIEW

[1] Statutory interpretation is a question of law that an appellate court resolves independently of the trial court.[3]

[2] An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.[4]

## V. ANALYSIS

### 1. Jurisdiction

[3] We begin with an error assigned on cross-appeal: that the juvenile court lacked subject matter jurisdiction. Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.[5] Section 43-247 provides for the juvenile court's jurisdiction over certain individuals and proceedings.

Tiffany's argument is confusing. She concedes that venue was proper. Nonetheless, she argues, "There was simply no evidence presented by the state during the trial as to where

---

[3] *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

[4] *In re Interest of Michael N.*, 302 Neb. 652, 925 N.W.2d 51 (2019).

[5] *Green v. Seiffert, ante* p. 212, 933 N.W.2d 590 (2019).

the alleged incidents in its petition occurred, and without that evidence, the court cannot find that it has jurisdiction in this matter."[6] But in a proceeding under the Nebraska Juvenile Code, the State is not required to prove proper venue, because proof of venue is immaterial to the determination of whether a juvenile falls within the meaning of § 43-247.[7]

A juvenile court petition is to be filed with the clerk of the court having jurisdiction over the matter.[8] The petition here, filed with the clerk of the district court[9] for Douglas County, alleged that the juveniles were living within Nebraska and that Tiffany lived in Omaha, Nebraska. Even if a petition seeking to adjudicate a juvenile was filed in a county other than the county where the juvenile is presently living or domiciled, Neb. Rev. Stat. § 43-282 (Reissue 2016) allows for proceedings to be transferred, after adjudication, to the county where the juvenile lives or is domiciled. We conclude that the separate juvenile court of Douglas County had subject matter jurisdiction. We turn to the merits.

## 2. Adjudication

We emphasize at the outset that the sole ground alleged by the State for adjudication under § 43-247(3)(a) was that the juveniles lacked proper parental care by reason of the fault or habits of Tiffany and Brandon (as to Savannah only). Section 43-247(3)(a) sets forth numerous grounds by which the juvenile court could take jurisdiction over a juvenile, but the State alleged only one.

Under § 43-247(3)(a), a juvenile court has jurisdiction of any juvenile

who is homeless or destitute, or without proper support through no fault of his or her parent, guardian, or

---

[6] Reply brief for appellee on cross-appeal at 6.

[7] See *In re Interest of Leo L.*, 258 Neb. 877, 606 N.W.2d 783 (2000).

[8] Neb. Rev. Stat. § 43-261(1)(b) (Reissue 2016).

[9] See *id.*

custodian; who is abandoned by his or her parent, guardian, or custodian; *who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian*; whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile; whose parent, guardian, or custodian is unable to provide or neglects or refuses to provide special care made necessary by the mental condition of the juvenile; who is in a situation or engages in an occupation, including prostitution, dangerous to life or limb or injurious to the health or morals of such juvenile; or who, beginning July 1, 2017, has committed an act or engaged in behavior described in subdivision (1), (2), (3)(b), or (4) of this section and who was under eleven years of age at the time of such act or behavior[.]

(Emphasis supplied.) It is obvious that the State's chosen ground was only one among the many which were available.

[4-6] The factual allegations of a petition seeking to adjudicate a child must give a parent notice of the bases for seeking to prove that the child is within the meaning of § 43-247(3)(a).[10] And the State then has the burden to prove the allegations of the petition by a "preponderance of the evidence,"[11] which is the equivalent of the greater weight of the evidence.[12] The greater weight of the evidence means evidence sufficient to make a claim more likely true than not true.[13]

Here, because the State alleged only one ground—that the juveniles lacked proper parental care by reason of the fault or habits of their parent, guardian, or custodian—we narrow our focus to that ground only.

---

[10] *In re Interest of Taeven Z.*, 19 Neb. App. 831, 812 N.W.2d 313 (2012).

[11] See Neb. Rev. Stat. § 43-279.01 (Reissue 2016).

[12] See *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019).

[13] *Flores v. Flores-Guerrero*, 290 Neb. 248, 859 N.W.2d 578 (2015).

### (a) Justification for State
### Involvement

[7-9] The State's right in juvenile proceedings is derived from its parens patriae interest, and it is pursuant to that interest that the State has enacted the Nebraska Juvenile Code.[14] The State has a right to protect the welfare of its resident children, which is a governmental interest of great importance.[15] This right is especially prominent in juvenile adjudications, because the purpose of the adjudication phase of a juvenile proceeding is to protect the interests of the child.[16]

### (b) Interpretation of § 43-247(3)(a)

Key to our analysis is the meaning of the phrase "lacked proper parental care." Specifically, in that context, does the adjective "parental" describe the type and nature of care or the person providing the care? The plain meaning of the statute, supported by our case law, dictates that it describes type and nature.

[10-12] Statutory language is to be given its plain and ordinary meaning.[17] In other words, in discerning the meaning of a statute, a court should determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense.[18] And we liberally construe statutes within the Nebraska Juvenile Code to accomplish its purpose of serving the best interests of the juveniles who fall within it.[19]

The structure of the phrase is significant. In assessing whether a juvenile "lacks proper parental care by reason of the

---

[14] *In re Interest of Noah B. et al.*, 295 Neb. 764, 891 N.W.2d 109 (2017). See, also, Neb. Rev. Stat. § 43-246 (Supp. 2019).

[15] See *In re Interest of Noah B. et al., supra* note 14.

[16] *Id.*

[17] *Christine W. v. Trevor W.*, 303 Neb. 245, 928 N.W.2d 398 (2019).

[18] See *Weatherly v. Cochran*, 301 Neb. 426, 918 N.W.2d 868 (2018).

[19] See *In re Interest of Gabriela H.*, 280 Neb. 284, 785 N.W.2d 843 (2010).

fault or habits of his or her parent, guardian, or custodian,"[20] the initial focus is on the first component: Does the juvenile lack proper parental care? Typically, only if this question is answered in the affirmative does one look to the cause: whether the lack of proper parental care is due to the fault or habits of the juvenile's parent, guardian, or custodian.

The history of the phrase and our cases construing it support our interpretation—that "parental" describes the type and nature of care. In 1955, the Legislature crafted the current language of "lacks proper parental care by reason of the fault or habits of his parent, guardian, or custodian."[21] In 1962, we stated that "[l]egislation authorizing proceedings to declare a child neglected and dependent is applicable only to emergency situations where the child's needs must be met."[22] Although the trial court in that case had found that the children were neglected, we stated:

Its findings were restricted in their reference to the parents only and in no way made reference to what was being done for the [children] by the [couple] who had them in custody. It appears plainly that at that time they were carefully nurtured, cared for, and loved by them.[23]

Five years later, we announced a definition of the phrase "neglected child."[24] We stated:

A neglected child is a child under 18 years of age who is abandoned by his parent, who lacks proper parental care by reason of the fault or habits of the parent, or whose parent neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such child.[25]

---

[20] § 43-247(3)(a).

[21] See 1955 Neb. Laws, L.B. 163.

[22] *State v. Gross*, 173 Neb. 536, 544, 114 N.W.2d 16, 20 (1962).

[23] *Id.* at 540-41, 114 N.W.2d at 19.

[24] See *Mullikin v. Lutkehuse*, 182 Neb. 132, 153 N.W.2d 361 (1967).

[25] *Id.* at 134, 153 N.W.2d at 363.

But for two reasons we do not understand our 1967 definition to mean neglect can be based only on a parent's actions or inactions. First, the definition merely repeated the language of the statute while omitting any references to the other statutory words "guardian" or "custodian."[26] Second, if the concern was whether the neglect was by a parent only, it would have been unnecessary for us to discuss in that case whether the child was receiving proper care by her grandmother—the child's custodian at the time of filing the petition.

[13,14] We conclude that "parental" as used in the phrase "lacks proper parental care" describes the type and nature of care rather than the relationship of the person providing it. As we explained in 1979, "proper parental care" includes

> providing a home, support, subsistence, education, and other care necessary for the health, morals, and well-being of the child. It commands special care for the children in special need because of mental condition. It commands that the child not be placed in situations dangerous to life or limb, and not be permitted to engage in activities injurious to his health or morals.[27]

These responsibilities can be performed by a parent or someone standing in place of a parent.

The State advances two contrary arguments, but neither is persuasive. One argument is that "lack[ing] proper parental care" under § 43-247(3)(a) includes abandonment by a parent. But this argument fails because abandonment is specifically covered by a separate ground within § 43-247(3)(a). Immediately before the "lacks proper parental care" ground, the statute provides a ground for adjudication of a juvenile "who is *abandoned* by his or her parent, guardian, or custodian."[28] Because § 43-247(3)(a) separately allows adjudication of a juvenile who is abandoned, "lack[ing] proper parental care"

---

[26] See Neb. Rev. Stat. § 43-201(3) (Reissue 1974).

[27] *State v. Metteer*, 203 Neb. 515, 520, 279 N.W.2d 374, 377 (1979).

[28] § 43-247(3)(a) (emphasis supplied).

under § 43-247(3)(a) focuses on something other than abandonment. And the State did not allege abandonment.

[15] The State's other argument is textual. The State asserts that "parental" is focused on performance by a parent. But this argument is inconsistent with the remainder of the phrase "by reason of the fault or habits of his or her parent, guardian, or custodian."[29] If "parental care" could only be provided by a parent, there would be no reason for the statute to include a child's guardian or custodian. A court must attempt to give effect to all parts of a statute, and if it can be avoided, no word, clause, or sentence will be rejected as superfluous or meaningless.[30]

Case law from other jurisdictions supports our long-standing interpretation that "parental" describes the type of care. The Supreme Court of Texas declared:

The term, "parental care," as used in the statute is purely descriptive; it refers to the kind and quality of care which should be, and ordinarily is, provided by parents. . . . "Parental care" may be provided by persons who occupy a parental position in the life of a child, either permanently or temporarily.[31]

Similarly, the Oregon high court stated that "'parental care may be provided by persons who are not parents or guardians" and that "[t]he 'parental care' of which the statute speaks is the kind of care to be expected of a good father and mother."[32] The North Dakota Supreme Court defined the phrase "proper parental care" to mean the ""'"minimum standards of care which the community will tolerate.""'"[33] And the Vermont Supreme Court

---

[29] § 43-247(3)(a).

[30] *In re Interest of Marcella G.*, 287 Neb. 566, 847 N.W.2d 276 (2014).

[31] *Hendricks v. Curry*, 401 S.W.2d 796, 801 (Tex. 1966) (superseded by statute on other grounds as noted in *In re Interest of R.D.S.*, 902 S.W.2d 714 (Tex. App. 1995)).

[32] *In re Murphy*, 218 Or. 514, 521, 346 P.2d 367, 370 (1959) (en banc).

[33] *Interest of J.B.*, 916 N.W.2d 787, 789 (N.D. 2018).

determined that the term "parental care" did not compel an adjudication whenever incapacitated parents leave their children with relatives or others to provide parental care during the period of incapacitation.[34]

To summarize, whether a juvenile "lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian" is a two-step inquiry. The first step is to determine if the juvenile is lacking proper parental care, whether such care is being provided by a parent, a guardian, or a custodian. If the juvenile is not lacking that type of care (and, as discussed below, there is no definite risk of harm), adjudication under this provision of § 43-247(3)(a) is improper. If, on the other hand, the juvenile is lacking such care, the court should proceed to the second step: Does that condition result from the fault or habits of the juvenile's parent, guardian, or custodian? If the answer to that question is also yes, then the juvenile court should take jurisdiction of the juvenile and proceed to a proper disposition.

### (c) Risk of Harm

[16] In considering whether a juvenile lacks proper parental care, our case law has incorporated a risk of harm component. This stems from the part of the definition of proper parental care "command[ing] that the child not be placed in situations dangerous to life or limb, and not be permitted to engage in activities injurious to his health or morals."[35] We have stated: "While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm."[36]

---

[34] See *In re G.C.*, 170 Vt. 329, 749 A.2d 28 (2000).

[35] *State v. Metteer, supra* note 27, 203 Neb. at 520, 279 N.W.2d at 377.

[36] *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 846, 910 N.W.2d 789, 799 (2018). Accord, *In re Interest of Lilly S. & Vincent S.*, 298 Neb. 306, 903 N.W.2d 651 (2017); *In re Interest of Justine J. et al., supra* note 2. See, also, *In re Interest of Anaya*, 276 Neb. 825, 758 N.W.2d 10 (2008).

In other words, we view risk of harm as a component of a lack of proper parental care. This principle is often invoked where a juvenile is arguably receiving proper parental care, but faces a definite risk of harm. For example, in *Jones v. State*,[37] a child was receiving appropriate care by his caregivers, but his mother was threatening to take the child and the caregivers sought the court's aid to protect the child. Because "there was every reason to believe that the child was in danger of becoming a neglected child if removed from his present home in Nebraska,"[38] we reversed the trial court's judgment of dismissal. Similarly, we determined that where a child "was in danger of becoming a dependent and neglected child in the immediate future if his custody was given to [his parents,] the court should take jurisdiction to protect his interests."[39] And in *In re Interest of M.B. and A.B.*,[40] although there was no indication that the children lacked proper parental care, the court adjudicated the children because their father/stepfather had been convicted of sex crimes against children. We affirmed, stating that "[i]f evidence of the fault or habits of a parent or custodian indicates a risk of harm to a child, the juvenile court may properly take jurisdiction of that child, even though the child has not yet been harmed or abused."[41]

More recently, we applied the risk of harm principle in *In re Interest of Justine J. et al.*,[42] the case relied upon by the juvenile court. There, the mother appealed from an order adjudicating her four children under § 43-247(3)(a). She did not challenge the adjudication of her two oldest children,

---

[37] *Jones v. State*, 175 Neb. 711, 123 N.W.2d 633 (1963).

[38] *Id.* at 717, 123 N.W.2d at 637.

[39] *Stewart v. McCauley*, 178 Neb. 412, 419-20, 133 N.W.2d 921, 926 (1965).

[40] *In re Interest of M.B. and A.B.*, 239 Neb. 1028, 480 N.W.2d 160 (1992).

[41] *Id.* at 1030, 480 N.W.2d at 161-62.

[42] *In re Interest of Justine J. et al., supra* note 2.

who had lived with her, but contested the adjudication of her two youngest children, who lived with their grandparents. We found that the State failed to meet its burden to show there was a definite risk of future harm to the youngest children by reason of the fault or habits of their mother while those children were living with their grandparents. We determined that the State failed to prove "an evidentiary nexus between the neglect suffered by [the oldest children] and any definite risk of future harm to [the youngest children]."[43]

### (d) Application to Current Case

#### (i) Jeremy

As to Jeremy, the facts are clear: he has already suffered harm from Tiffany's lack of parental care in failing to protect him from methamphetamine entering his body. He was exposed to Tiffany's drug use in utero. According to the undisputed evidence at the adjudication hearing, Tiffany admitted to Christensen that she had used methamphetamine within the week of Jeremy's birth and that she believed Jeremy would test positive for methamphetamine. Thus, there was persuasive evidence that Jeremy lacked proper parental care by reason of Tiffany's fault or habits. We conclude that the juvenile court erred by failing to adjudicate Jeremy.

#### (ii) Savannah and Ashton

But as to Savannah and Ashton, the circumstances differ. The outcome here is driven by the State's litigation strategy and deficiencies of the evidentiary record it developed.

First, the State elected not to allege that by entrusting the children to Tina, their grandmother, Tiffany abandoned the two siblings. If in the future Tiffany's drug addiction persists and she engages in conduct amounting to abandonment, the State may have reason to seek adjudication on that basis. But here,

---

[43] *Id.*, 286 Neb. at 255, 835 N.W.2d at 679.

the State did not do so. Rather, the sole ground advanced was lack of proper parental care.

Second, the record did not establish that Savannah or Ashton lacked such care or were at a definite risk of harm. The evidence established that they had been in Tina's physical custody, where they were provided with a place to sleep, food, and clothing. There was no evidence that they had been exposed to Tiffany's drug addiction or that they were at definite risk of being so exposed. Nor was there evidence that Tiffany had previously taken Savannah and Ashton from Tina or that she was threatening to do so. Indeed, all of the evidence was to the contrary. The State's assertion that Tiffany could remove the children from Tina's care at any time rested on pure speculation. Similarly, there was no evidence that Savannah was at risk of harm due to Brandon's fault or habits. But if in the future, these children are exposed to Tiffany's persistent drug use or she threatens or attempts to do so, our decision today would not prevent the State from taking prompt action to protect them.

In other words, should the situation change and the State acquire evidence that Savannah or Ashton lack proper parental care, whether it would be by reason of the fault or habits of their custodian or their parents, the State should again petition the juvenile court for adjudication pursuant to § 43-247(3)(a). But in this appeal, because the State did not show that Savannah and Ashton lacked proper parental care, the juvenile court properly declined to adjudicate them.

### (e) Remaining Assignments of Error

Both the State and Tiffany assign errors regarding certain findings and conclusions by the juvenile court. In our de novo review, we have reached conclusions independently of the trial court's findings and have disregarded any findings and conclusions that were unsupported by the evidence. We need not discuss those assignments of error further.

## VI. CONCLUSION

We affirm the juvenile court's decision declining to adjudicate Savannah and Ashton, because they did not lack proper parental care. Because Jeremy did lack proper parental care, as demonstrated by Tiffany's drug use during pregnancy until the time of his birth, we reverse the juvenile court's decision declining to adjudicate him and remand the cause for further proceedings.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.