IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF BOSILEO D. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BOSILEO D. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CHRISTOPHER J., APPELLANT.

Filed March 15, 2022.     No. A-21-627.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Jeffrey A. Wagner and Joshua W. Pazderka, of Wagner, Meehan & Watson, L.L.P, for appellant.

Shinelle Pattavina, Deputy Douglas County Attorney, for appellee.

MOORE, BISHOP, and ARTERBURN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Christopher J. appeals the order of the separate juvenile court of Douglas County which adjudicated his minor children under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). He argues that the allegations in the petition were not proved by a preponderance of the evidence. We affirm.

- 1 -

## II. STATEMENT OF FACTS

### 1. PROCEDURAL BACKGROUND

Christopher is the father of Kayol J., born in May 2009; Amelius J., born in August 2014; and Bosileo D., born in June 2017. The children were removed from Christopher's care in January 2021 due to allegations of Christopher's physical abuse of the children and substance use. The children's mother is not a part of this appeal and will be discussed only as necessary.

The original petition, which contained allegations against the children's mother, is not included in our record. On January 26, 2021, the State filed a supplemental petition, alleging that the juvenile court had jurisdiction of the children because they came within the meaning of § 43-247(3)(a). Specifically, the State alleged that the children lacked proper parental care due to the faults or habits of Christopher because Christopher had engaged in domestic violence in the presence of the children; subjected the children to inappropriate physical contact; used alcohol and/or controlled substances; failed to provide proper parental care, support, supervision, and/or protection; failed to provide the children with safe, stable, and independent housing; and put the children at risk of harm.

### 2. ADJUDICATION HEARING EVIDENCE

The adjudication hearing was held over the course of 4 days in June 2021. Witnesses who testified at the hearing included Helena Clay-Veitch, the Nebraska Department of Health and Human Services caseworker who investigated the family; Kayol, who was 12 years old at the time of the adjudication hearing; and Ann Holmstrom, Kayol's therapist. Christopher also testified on his own behalf.

### (a) Clay-Veitch's Testimony

Clay-Veitch testified that she was assigned to an intake regarding the family on January 23, 2021. The intake alleged that the children felt unsafe in Christopher's care, Christopher had held up one of the children by his neck, Christopher was beating the children with a belt, and Christopher was using and selling drugs.

The following day, Clay-Veitch made contact with all three children at the home of their maternal grandmother. Clay-Veitch was prevented from testifying about the details of her conversation with Kayol as a result of a hearsay objection, but she did testify that the conversation gave her cause for concern.

Later that day, Clay-Veitch phoned Christopher to discuss the allegations of the intake. Clay-Veitch also informed Christopher that she had met with the children and their maternal grandmother, and that she relayed the statements the children had made to Clay-Veitch regarding Christopher. Christopher responded that he "could not believe his children would do him dirty like this." Despite Clay-Veitch's attempts to redirect Christopher and formulate a safety plan, Christopher began cursing at Clay-Veitch while oscillating between laughing and crying. Clay-Veitch was ultimately able to create a verbal safety plan with Christopher over the phone. However, Clay-Veitch did not go to Christopher's home to have Christopher sign a written safety plan, as the way Christopher had spoken to her over the phone was "threatening" and she was concerned for her safety.

On January 26, 2021, Clay-Veitch continued her investigation into the family by reviewing the family's child welfare file, including earlier intakes, and by contacting two caseworkers who had previously worked with the family. Documentation regarding the family's previous child welfare cases is not included in our record. At the close of her investigation, Clay-Veitch determined that Kayol, Amelius, and Bosileo were at risk for harm.

### (b) Kayol's and Christopher's Testimony

Christopher testified that he had previously been involved in a child welfare case before the juvenile court, and during that time, the children had been placed in foster care. The record is unclear as to when the children were removed from the home in the previous child welfare case. However, Christopher did testify that the children were not placed with him for 4 years, though he did not know the reason why. Amelius and Bosileo returned to Christopher's care in December 2019 and Kayol returned in March 2020. The previous child welfare case was closed in September 2020 when a bridge order granted Christopher custody of the children.

Kayol and Christopher also provided testimony directly related to the allegations in the supplemental petition in the current case.

### (i) Alleged Domestic Violence

Kayol testified that after leaving foster care in his previous child welfare case, he and his siblings first lived with Christopher and Christopher's mother in her home for about a week. Christopher and the children then moved into the home of Cassidy C., who Kayol identified as a "Saint Francis worker." By June 2020, Christopher, Cassidy, and the children moved into another home together.

The record is unclear as to Cassidy's professional and personal role with the family. Christopher testified that Cassidy was a visitation worker in the family's previous case and denied having a romantic relationship with her. Kayol did not know if his father and Cassidy were in a romantic relationship. The juvenile court later found that Cassidy was the family's "former case manager" and the "inference is that there was some sort of relationship between the father and [Cassidy]."

Kayol stated that Christopher and Cassidy would argue "[m]ostly every night" and that one argument became physical. On that occasion, Kayol and his brothers were inside the home when he heard Christopher and Cassidy shouting, a thud, and the sound of glass breaking. The following day, Kayol observed Cassidy's hand to be swollen and bruised. Cassidy moved out of the family home in the fall of 2020.

Kayol also testified that the children's mother resided with Christopher and the children in December 2020. During this time, the children's mother and Christopher would occasionally become physical when arguing. Kayol recounted that on one of these occasions, Christopher and the children were "horseplaying" and Christopher became angry, as one of the children had hit him in the ribs. Christopher then "went after" the child and the children's mother pulled Christopher's shirt to tug him away from the child. Christopher then "laid" on the children's mother and "put all the weight on her." Kayol stated that his mother's face was red and Christopher appeared to be hurting her. In an effort to protect their mother, Kayol and Amelius jumped on top of Christopher so that he would take his weight off of her.

Christopher testified that when Kayol was returned to his care in March 2020, he was living with his mother and his other two children in his mother's home. Christopher and the children remained there until Christopher acquired his own residence in July. Christopher noted that only he and the children lived at his new residence.

Christopher denied ever being in a relationship with, living with, or injuring Cassidy. Christopher likewise denied engaging in domestic violence with the children's mother.

### (ii) Alleged Physical Abuse

Kayol testified that Christopher acted aggressively toward the children "almost every night." Kayol described Christopher regularly hitting, throwing items, and yelling at the children. Kayol stated that Christopher would hit the children with both a closed and open hand, which would leave a bruise "the size of a golf ball." Christopher would also "pop [the children] in the face" and cause their noses to bleed. Kayol estimated that he has had a bloody nose as a result of Christopher hitting him about 20 times. Kayol also testified that Christopher had hit the children with a belt. At times, Christopher would wet the belt before using it to hit the children. Kayol estimated that Christopher has hit him with a belt more than 10 times.

Kayol further testified that as a form of punishment, Christopher would place the children in the shower and run "freezing water" over the children while they were fully clothed. Kayol was required to stay in the cold shower until he had counted to "60 Mississippis." Kayol estimated that Christopher placed him in a cold shower as punishment more than 10 times.

When asked whether Christopher had ever threatened Kayol, Kayol recounted that in the winter of 2020, he was sitting at the table doing homework when Christopher approached him and stated, "I'm going to break your fingers." Kayol was unsure if Christopher had any reason to make this threat.

In Christopher's testimony, he denied striking the children or using any sort of physical discipline, including hitting the children with a belt of any kind. Instead, Christopher disciplined the children by granting them privileges when they behaved and revoking the privileges when the children did not follow directions or listen well. Additionally, due to the family's previous child welfare case, case professionals frequently visited Christopher's home to check on the children from December 2019 until that case was closed in September 2020. No case professionals or law enforcement officers voiced concerns to Christopher regarding potential maltreatment of the children while the previous child welfare case was open. However, Christopher did acknowledge that case professionals came to the home less frequently after Kayol returned to his care in March 2020.

### (iii) Alleged Substance Use

Kayol testified that he saw Christopher drink frequently and saw him in a state of drunkenness "[e]very couple nights." Kayol stated that he was scared when Christopher consumed alcohol because, "[w]hen he's drunk, he's very aggressive." Kayol also estimated that Christopher drove drunk with the children in the car more than 20 times.

Kayol also testified to seeing Christopher use marijuana nightly. He would additionally observe Christopher leave the family home with a baggie of marijuana and return with $1,000 in

his pocket, which Christopher would then show to Kayol. Kayol estimated that Christopher left the home with marijuana and returned with money more than 20 times.

Christopher testified that he had been on probation for 2 years until January 2021 and that participating in random drug testing twice a week was a requirement of his probation. When asked for what charges Christopher was placed on probation, Christopher responded that all he knew "is that it was a misdemeanor." Christopher stated that his probation was never violated and that he never tested positive for any controlled substances during his probation. Christopher also denied that he would leave his home with marijuana and return with money.

### (iv) Alleged Lack of Supervision

Kayol testified that the children were left home alone for most of the day three or four times a week. Kayol was 11 years old and was left to care for his bothers, who were then 6 and 3 years old. Kayol noted that because Christopher would not return home until 9 p.m., Kayol would prepare meals and supervise his brothers until they went to sleep. Christopher would sometimes call to check in on the children several times in a day, but there were also days when Christopher would not call the children at all. In March 2020, the children's school was not in session due to the COVID-19 pandemic. When the children returned for in-person school in October, either Christopher or their paternal grandmother would pick the children up from school. On days when Christopher would pick the children up from school, he would then drop the children off at the house and leave them home alone.

Christopher testified that while the children's school was not in session due to the COVID-19 pandemic, he enrolled all three children in his mother's licensed home daycare. If his mother was not available for daycare, Christopher arranged for another adult to provide care to the children. When the children's school resumed, Christopher described a normal weekday schedule for the family as, "[s]chool, soccer, homework, dinner, shower, bed."

### (v) Kayol's Lack of Previous Disclosures

On cross-examination, Kayol was asked whether he had previously reported the allegations of physical abuse and neglect by Christopher. Kayol stated that he had told both his maternal grandmother and his cousin about Christopher using cold showers as discipline. Kayol also reported to his cousin that he did not want to live with Christopher because Christopher was "abusive" and was giving the children nosebleeds. In addition, Kayol recalled telling his maternal grandmother that he and his brothers were often left home alone and that Christopher was using marijuana.

Kayol stated that he had reported that Christopher was abusing him 5 years ago, when he was in first grade, and that Christopher had "found out" about Kayol's disclosure. Kayol testified that he was scared that making a disclosure regarding Christopher's more recent abuse to either a teacher or a caseworker would again be reported back to Christopher. Kayol explained that he had disclosed the recent abuse to his cousin because he knew his cousin would not report the disclosure back to Christopher.

Christopher testified that Kayol's recent disclosure of abuse was influenced by the children's maternal grandmother. Christopher noted that it was after Christopher allowed the children to resume contact with their maternal grandmother that the abuse and neglect allegations

against Christopher were made. Christopher stated that the children's maternal grandmother was not supportive of the children reunifying with Christopher and that Kayol's disclosure was motivated by a desire to return to his maternal grandmother's home, as she had previously been a placement for the children.

*(vi) Christopher's Memory Issues*

Christopher testified that he suffered a traumatic brain injury in 2009, which has impacted his memory. However, Christopher stated that he does not suffer from memory problems that "relates to [his] children." Throughout his testimony Christopher was unable to recall the charges that placed him on probation or the details of his criminal case in general. Christopher was likewise unable to recall the circumstances of the family's previous child welfare case; including why the children were removed from the home and remained out of his care for 4 years, and whether he had pled no contest to an allegation of domestic violence between himself and the children's mother.

(c) Holmstrom's Testimony

The State called Holmstrom, a licensed mental health practitioner, as a rebuttal witness. Kayol was previously a client of Holmstrom in 2019 until 2020, and she began seeing him again in April of 2021. She testified generally about trauma-informed therapy and how she emphasizes the importance of truthfulness with her child clients; however, she was not allowed to give an opinion as to Kayol's truthfulness. Following an offer of proof, the juvenile court indicated that it did not consider Holmstrom's testimony and noted that her testimony was cumulative of testimony already received concerning Kayol.

3. ADJUDICATION ORDER

On July 20, 2021, the juvenile court entered an order finding that the State had proven all counts of the supplemental petition by a preponderance of the evidence and adjudicating Kayol, Amelius, and Boselio as juveniles within the meaning of § 43-247(3)(a). The court specifically found that the testimonies of the State's witnesses, Kayol and Clay-Veitch, were "reliable, credible, probative, and entitled to weight" and that testimony of Christopher was not "reliable, credible [or] probative" and gave it no weight. Regarding Kayol, the court "found [him] to be focused, declarative, and firm with respect to his memory" and that he did not need guidance from counsel or other persons as he described his experiences with his father. The court noted the father's contention that Kayol was smiling at one point during his testimony, but such observation was "not captured by the court." The court found that Kayol "clearly identified his knowledge of alcohol and knowledge of persons in a state of intoxication." Regarding its finding of credibility, the court went on to say,

> While the number of some of Kayol's observations of conduct by the father were surprising to the court, there is no reliable, credible, probative evidence in the record to cause the court to reduce the weight accorded to the testimony of Kayol [J.]
>
> By contrast, the court finds that the father's testimony simply lacks reliability and credibility. Notwithstanding the fact that a prior case had been recently terminated, he

stated he did not recall the reasons for the court's jurisdiction. This is notwithstanding the fact that the children were in out of home care for four years.

The court also found that it would be in the children's best interests to remain in the Department of Health and Human Service's temporary custody for appropriate care and placement to exclude Christopher's home.

Christopher appeals.

## III. ASSIGNMENTS OF ERROR

Christopher assigns, restated, that the juvenile court erred in finding that (1) Kayol's testimony was credible, (2) Christopher's testimony was not credible, and (3) the State had proved the allegations in the petition by a preponderance of the evidence.

## IV. STANDARD OF REVIEW

Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Prince R.*, 308 Neb. 415, 954 N.W.2d 294 (2021).

## V. ANALYSIS

In order to obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). The purpose of the adjudication phase is to protect the interests of the child. *Id*. The Nebraska Juvenile Code does not require the juvenile court to wait until disaster has befallen a minor child before the court may acquire jurisdiction. See *In re Interest of Kane L. & Carter L.*, supra.

While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm. *Id*. The State must prove such allegations by a preponderance of the evidence. *Id*. See, also, *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 743, 936 N.W.2d 733, 742 (2020) ("'preponderance of the evidence' . . . is the equivalent of the greater weight of the evidence"; "greater weight of the evidence means evidence sufficient to make a claim more likely true than not true").

Christopher argues that the juvenile court erred in adjudicating Kayol, Amelius, and Boselio. He contends that the State failed to prove by a preponderance of the evidence that the children were at risk of future harm because the "only evidence provided by the State is testimony of the minor child who was motivated to lie to achieve what he perceived to be a better living situation with his grandma." Brief for appellant at 9. In support of this theory, Christopher points to the State's failure to call any other witnesses to corroborate Kayol's allegations and to verify the results of Christopher's probationary drug tests.

However, Kayol testified under oath at the adjudication hearing to specific allegations of abuse and neglect which, if true, would clearly support the children's adjudication within the meaning of § 43-247(3)(a). Kayol recounted observing Christopher engage in domestic violence with both Cassidy and the children's mother, being hit and physically disciplined by Christopher, being driven in a car by Christopher while Christopher was intoxicated, and frequently being left home alone at age 11 for most of the day to care for his younger brothers. Kayol testified that he had not made disclosures to teachers and case professionals regarding Christopher's abuse out of fear the disclosures would be reported back to Christopher. Further, Clay-Veitch testified that after interviewing the children, their maternal grandmother, and Christopher, and after reviewing collateral information, including the family's past intakes and child welfare case, she believed the children were at risk of harm.

Although we conduct a de novo review of the record, we note that where credible evidence is in conflict on a material issue of fact, we may consider and give weight to the fact that the trial judge heard and observed the witnesses and accepted on version of the facts rather than another. See *In re Interest of Brian B. et al.*, 268 Neb. 870, 689 N.W.2d 184 (2004). The juvenile court made explicit findings as to the credibility of Kayol's and Christopher's testimony, and we consider and give weight to that finding here. We therefore find that there is sufficient evidence in the record to support the court's determination that the children come within the meaning of § 43-247(3)(a).

## VI. CONCLUSION

Upon our de novo review of the record, we conclude that the evidence was sufficient to support the juvenile court's order adjudicating Kayol, Amelius, and Boselio under § 43-247(3)(a). We affirm.

AFFIRMED.