IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF BLESSING T.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BLESSING T., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

OSCAR K., APPELLANT, AND FAIDA M., APPELLEE.

Filed December 9, 2025.    No. A-24-869.

Appeal from the County Court for York County: C. JO PETERSEN, Judge. Affirmed.

Jerrod Jaeger, of Jaeger Law Office, P.C., L.L.O., for appellant.

Christopher M. Johnson, Chief Deputy York County Attorney, for appellee State of Nebraska.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

RIEDMANN, Chief Judge.

## INTRODUCTION

The county court for York County, sitting as a juvenile court, adjudicated Blessing T. as a child within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Her father, Oscar K., appeals, challenging the court's determination. For the following reasons, we affirm.

## BACKGROUND

Faida M. is the biological mother of Blessing, born on June 26, 2024. As disclosed to the court at the later adjudication hearing, the Department of Health and Human Services (DHHS) had been involved with Faida since 2023 because of concerns she was physically abusing Blessing's older siblings. These children were removed from Faida's care, and the State had filed to terminate her parental rights.

- 1 -

Despite its ongoing involvement with the family, DHHS was unaware that Faida was pregnant with Blessing or that Blessing had been born. DHHS eventually received information from a foster care worker that Faida may have given birth to another child, and on July 1, 2024, it contacted the hospital and confirmed Blessing had been born. DHHS contacted Faida, and she originally denied having given birth. However, on July 2, Faida admitted that Blessing had been born, but told DHHS Blessing was with an unknown individual, and she did not know where Blessing was located.

DHHS workers saw Blessing for the first time on July 5, 2024. From that point on, Blessing was living at the home of either Faida or her adult daughter, Joyce M.

On July 25, 2024, the State filed a petition for adjudication of Blessing. The petition alleged that Blessing was a child within the meaning of § 43-247(3)(a) because she lacked proper parental care by reason of the fault or habits of her parents, guardian, or custodian, and her parents, guardian, or custodian neglected or refused to provide proper or necessary subsistence, education, or other care necessary for her health, morals, or wellbeing.

In support of these allegations, the State stated that Faida was currently a party in multiple abuse and neglect cases in York County involving allegations of severe abuse of Blessing's siblings; Faida had hid her pregnancy with Blessing from all individuals involved in the other abuse and neglect cases; Faida's parental rights to the other children were currently pending termination; and, since Blessing's birth, Faida had taken several actions which indicated she had a high potential to flee the jurisdiction with Blessing and that she was making decisions which jeopardized Blessing's health and welfare. These included sending Blessing with unknown individuals after her birth, denying that a pregnancy existed or that birth occurred, and claiming that she did not know who the individuals caring for Blessing were or whether they were capable of providing appropriate safety for Blessing. The State also filed a motion for ex parte temporary custody, which was granted on July 26, 2024.

Blessing was removed from Faida's home on July 26, 2024, and a protective custody hearing was held in August. At this hearing, evidence showed that Oscar was the father of Faida's other children. The court asked Faida whether Oscar was also Blessing's father, but she denied his paternity. At the close of this hearing, the court ordered Faida to provide DHHS with contact information for potential fathers of Blessing. It also ordered that a paternity test be conducted to rule out Oscar's paternity. Paternity testing later confirmed that Oscar was Blessing's father.

The State filed an amended petition in the county court, which asserted Oscar's paternity and provided additional statements in support of its allegation that Blessing was a child within the meaning of § 43-247(3)(a). These included that Oscar was presently incarcerated and that, even when not incarcerated, his mental health did not allow for him to safely parent Blessing.

An adjudication hearing was held in October and November 2024. Kaelee Walbrecht, a child and family services specialist with DHHS, testified that she had been working with Faida since September 2023 because of the concerns that she was physically abusing her other children. Walbrecht also testified that Faida never informed DHHS that she was pregnant with Blessing or that Blessing had been born. When Walbrecht contacted Faida after confirming Blessing's birth with the hospital, both Faida and Joyce indicated that there was no baby. Rather, they explained that Faida had been in the hospital due to high blood pressure and other medical concerns.

When Faida finally admitted to Walbrecht that Blessing had been born, she told Walbrecht she would have to call her mother, who lived in Sweden, to find out who had Blessing and where this unknown person had taken her. DHHS was unaware of Blessing's location during the time between her discharge from the hospital on June 30, 2024, until July 5, when DHHS workers saw her for the first time.

Faida later told Walbrecht that, beginning July 5, 2024, Blessing was living between her and Joyce's homes, but she was primarily residing with Joyce. When Walbrecht went to remove Blessing from Faida's home, Faida was not there, but Joyce was and she stated that she was Blessing's legal guardian. DHHS later discovered that, on July 8, Joyce had filed a petition in the county court for Buffalo County for appointment of a temporary guardianship for Blessing. Faida had also filed a separate document nominating Joyce to be appointed as Blessing's guardian. On July 9, the Buffalo County Court appointed Joyce as Blessing's temporary guardian, and the appointment was set to expire on October 9.

According to Walbrecht, DHHS had not known about the guardianship because it was filed in Buffalo County, while Faida and Blessing were residents of York County, and Faida had initially provided an inaccurate name for Blessing by presenting Blessing's middle name as her legal last name. The fact that Faida had provided an incorrect name for Blessing, and that the guardianship was filed in a different county than where Faida lived, combined with Faida's deception surrounding her pregnancy and Blessing's birth, led DHHS to believe Faida was attempting to hide the existence of the guardianship.

DHHS did not have any knowledge to suggest Blessing had improper care between July 5, 2024, and her removal. DHHS was predominantly concerned with the safety threat created by Faida's prior involvement with DHHS and her history of physical discipline against her other children.

Concerning Oscar, Walbrecht testified she had contacted Oscar shortly after Blessing's birth and he denied being aware that Faida was in the hospital or that she had had a baby. Although he denied paternity on several occasions, he later admitted that he was Blessing's father.

Walbrecht also testified that Oscar was presently incarcerated on domestic violence charges in which Faida was the victim. She stated that Oscar's problem with anger management was one of DHHS' concerns about him. However, Walbrecht testified that she could not answer whether Oscar's mental health prevented him from safely parenting Blessing because she was not qualified to speak on the matter, and any statement would be solely an expression of personal belief.

On November 1, 2024, the court found that the State had met its burden to prove the allegations in the amended petition by a preponderance of the evidence. The court therefore adjudicated Blessing under § 43-247(3)(a). The record shows that both parents have filed an appeal, but only Oscar filed a brief.

## ASSIGNMENT OF ERROR

Oscar assigns as error, restated, the county court erred by finding the State had met its burden of proof regarding the allegations in the amended petition to adjudicate Blessing under § 43-247(3)(a).

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. See *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022).

ANALYSIS

Here, the State alleged that Blessing was within the meaning of § 43-247(3)(a) because she lacked proper parental care by reason of the fault or habits of her parents, and because her parents neglected or refused to provide proper or necessary subsistence, education, or other care necessary for her health, morals, or well-being. The court found that the State had met its burden to prove the allegations of the amended petition and adjudicated Blessing under § 43-247(3(a).

The purpose of the adjudication phase is to protect the interests of the child. *In re Interest of Xandria P., supra*. At the adjudication stage, in order for a juvenile court to assume jurisdiction of a minor child under § 43-247(3)(a), the State must prove the allegations of the petition by a preponderance of the evidence, and the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. See *In re Interest of Ky'Ari J.*, 29 Neb. App. 124, 952 N.W.2d 715 (2020).

Under § 43-247(3)(a), a juvenile court has jurisdiction over any juvenile

who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian; [or] whose parent, guardian, or custodian neglects or refuses to provide proper or necessary subsistence, education, or other care necessary for the health, morals, or well-being of such juvenile[.]

Oscar argues that because there was no evidence of either parent neglecting or refusing to provide proper or necessary subsistence, education, or other care, the only inquiry is whether Blessing lacked proper parental care. He concludes that because Walbrecht did not testify that Blessing appeared to be lacking proper parental care the two times she saw Blessing, the State failed in its burden of proof. We disagree.

The Nebraska Supreme Court has explained that proper parental care includes:

providing a home, support, subsistence, education, and other care necessary for the health, morals, and well-being of the child. It commands special care for the children in special need because of mental condition. It commands that the child not be placed in situations dangerous to life or limb, and not be permitted to engage in activities injurious to his [or her] health or morals.

*In re Interest of Jeremy U. et al.*, 304 Neb. 734, 746, 936 N.W.2d 733, 743 (2020), quoting *State v. Metteer*, 203 Neb. 515, 520, 279 N.W.2d 374, 377 (1979).

In *In re Interest of Jeremy U. et al., supra*, the Supreme Court discussed this concept at length. It explained that

whether a juvenile "lacks proper parental care by reason of the fault or habits of his or her parent, guardian, or custodian" is a two-step inquiry. The first step is to determine if the juvenile is lacking proper parental care, whether such care is being provided by a parent, a guardian, or a custodian. If the juvenile is not lacking that type of care (and, . . . there is no

- 4 -

definite risk of harm), adjudication under this provision of § 43-247(3)(a) is improper. If, on the other hand, the juvenile is lacking such care, the court should proceed to the second step: Does that condition result from the fault or habits of the juvenile's parent, guardian, or custodian? If the answer to that question is also yes, then the juvenile court should take jurisdiction of the juvenile and proceed to a proper disposition.

*In re Interest of Jeremy U. et al., supra*, 304 Neb. at 748, 936 N.W.2d at 744-45.

Critical to the present case is the Supreme Court's discussion of "risk of harm" in *Jeremy U.* It explained that

In considering whether a juvenile lacks proper parental care, our case law has incorporated a risk of harm component. This stems from the part of the definition of proper parental care "command[ing] that the child not be placed in situations dangerous to life or limb, and not be permitted to engage in activities injurious to his health or morals." We have stated: "While the State need not prove that the child has actually suffered physical harm, Nebraska case law is clear that at a minimum, the State must establish that without intervention, there is a definite risk of future harm."

*Id.* at 748, 936 N.W.2d at 745 (citations omitted).

The *In re Interest of Jeremy U. et al.* court explained that the risk of harm is often invoked where a juvenile is arguably receiving proper parental care, but faces a definite risk of harm. It relied in part on *Jones v. State*, 175 Neb. 711, 123 N.W.2d 633 (1963), and *Stewart v. McCauley*, 178 Neb. 412, 133 N.W.2d 921 (1965), to illustrate that even if a child is receiving proper care in the placement with a third-party, he or she could still be adjudicated if the child is in danger of becoming a dependent and neglected child in the immediate future if his custody is given to his or her parents. *In re Interest of Jeremy U. et al., supra*, 304 Neb. at 749, 936 N.W.2d at 745.

Based on the facts of this case, a preponderance of the evidence supports a finding that Blessing is in danger of becoming a dependent and neglected child in the immediate future if her custody is given to Faida or Oscar.

The evidence showed that Faida had several open abuse and neglect cases with DHHS, based upon her severe abuse of her older children. Termination actions were pending on these cases at the time of Blessing's birth. Because of this, it is reasonable to conclude that Faida concealed and lied about her pregnancy and Blessing's birth and established a temporary guardianship in another county to evade DHHS' likely removal of Blessing. Joyce, as the petitioner for the temporary guardianship, failed to advise the court of the pending termination cases in her application for appointment. This deception, along with Joyce's participation in the deceit regarding Blessing's birth, calls into question who truly had custody of Blessing following her birth.

Oscar argues that the State failed to meet its burden of proof to show that Faida's alleged abuse of her other children, or her lying to DHHS about the circumstances of her pregnancy and Blessing's birth, placed Blessing at a definite risk for harm so as to properly adjudicate her under § 43-247(3)(a). We disagree.

The evidence presented was that Faida's parental rights were in the process of being terminated to her five other children based upon allegations of severe physical abuse. Oscar seems

to argue that because Blessing did not appear to be lacking in parental care, there was no proof she was at a definite risk for harm. But a court need not await harm before adjudicating a child; where a parent causes harm to one child and has not placed herself or himself in a position to regain custody of that child, a risk of future harm exists for his or her sibling. See *In re Interest of Ky'Ari J.*, 29 Neb. App. 124, 952 N.W.2d 715 (2020) (although adjudicated child not abused, abuse of sibling showed adjudicated child at risk for harm). See, also, *In re Interest of Phoenix L.*, 270 Neb. 870, 708 N.W.2d 786 (2006), *disapproved on other grounds, In re Interest of Destiny A. et al.*, 274 Neb. 713, 742 N.W.2d 758 (2007) (affirming adjudication of infant based upon mother's failure to correct conditions that led to adjudication of infant's siblings).

When combined with the deceptive actions of Faida surrounding her pregnancy, Blessing's birth, her whereabouts following discharge from the hospital, and the temporary guardianship, we find no error in the county court's order adjudicating Blessing based on the fault or habits of Faida. Oscar also argues that the State failed to meet its burden to prove that his mental health made him unable to parent Blessing. He asserts that no medical testimony, nor any witness "was called to opine with any authority on this issue." Brief for appellant at 16. He asserts the State alleged he was incarcerated, but there was no evidence that his incarceration ever resulted in Blessing being uncared for because Faida, or "her designee," were available to care for Blessing from her birth until her removal. *Id.*

It is uncontested that Oscar was incarcerated at the time of adjudication for charges related to domestic violence in which Faida was the victim. Placing Blessing in a situation in which domestic assault occurs would result in a risk of future harm. Furthermore, by virtue of his incarceration, Oscar is unable to provide Blessing with parental care. Therefore, even absent a mental health issue, adjudication of Blessing was proper, based upon the fault or habits of Oscar.

For these reasons, the State proved Blessing lacked proper parental care as the result of the fault or habits of her parents, and that she was at definite risk of future harm. The court thus did not err by adjudicating Blessing.

CONCLUSION

We affirm the order of the county court adjudicating Blessing as a child within the meaning of § 43-247(3)(a).

AFFIRMED.