Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
06/09/2023 09:08 AM CDT

In re Interest of T.W., alleged to be
developmentally disabled and a
threat of harm to others.
State of Nebraska, appellee,
v. T.W., appellant.

___ N.W.2d ___

Filed June 9, 2023.    No. S-22-652.

1. **Mental Health: Judgments: Final Orders: Appeal and Error.** In an appeal under the Developmental Disabilities Court-Ordered Custody Act, an appellate court reviews a district court's final order or judgment for errors appearing on the record.

2. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. **Judgments: Statutes: Appeal and Error.** Whether a decision conforms to law and the interpretation of statutes present questions of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court.

4. **Judgments: Appeal and Error.** An appellate court, in reviewing a district court judgment for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings.

5. **Jurisdiction: Appeal and Error.** Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it, and this is so even where neither party has raised the issue.

6. **Jurisdiction: Final Orders: Appeal and Error.** For an appellate court to acquire jurisdiction of an appeal, the party must be appealing from a final order or a judgment.

7. **Mental Health: Final Orders: Appeal and Error.** A proceeding involving involuntary commitment is a special proceeding for appellate purposes.

8. **Mental Health: Final Orders.** An order of disposition under the Developmental Disabilities Court-Ordered Custody Act that deprives a subject of his or her liberty for an indeterminate period of time affects a substantial right.

9. **Proof: Evidence: Words and Phrases.** A "preponderance of the evidence" is the equivalent of the greater weight of the evidence. The greater weight of the evidence means evidence sufficient to make a claim more likely true than not true.

10. **Expert Witnesses: Witnesses: Testimony.** Testimony of expert witnesses is not treated any differently in the factfinding process than that of witnesses generally when it comes to determining the weight and credibility of the testimony.

11. **Trial: Expert Witnesses.** A trier of fact is not bound to accept expert opinion testimony.

12. **Witnesses: Testimony.** The credibility of a witness is a question for the trier of fact, and it is within its province to credit the whole of the witness' testimony, or any part of it, which seemed to it to be convincing, and reject so much of it as in its judgment is not entitled to credit.

13. **Statutes: Legislature: Intent.** The fundamental objective of statutory interpretation is to ascertain and carry out the Legislature's intent.

14. **Statutes.** Statutes pertaining to the same subject matter should be construed together; such statutes, being in pari materia, must be construed as if they were one law and effect given to every provision.

15. **Statutes: Legislature: Intent.** In construing a statute, the legislative intention is to be determined from a general consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found, and the intent as deduced from the whole will prevail over that of a particular part considered separately.

16. **Constitutional Law.** Nebraska's separation of powers clause prohibits the three governmental branches from exercising the duties and prerogatives of another branch.

17. **Constitutional Law: Statutes.** Where a statute is susceptible of two constructions, under one of which the statute is valid while under the other it is unconstitutional or of doubtful validity, that construction which gives it validity should be adopted.

Appeal from the District Court for Dodge County: Geoffrey C. Hall, Judge. Affirmed.

Kenneth Jacobs, of Hug & Jacobs, L.L.C., for appellant.

Rachel M. Greifenkamp, Deputy Dodge County Attorney, for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Cassel, J.

## INTRODUCTION

In this Developmental Disabilities Court-Ordered Custody Act (DDCCA)[1] appeal, the subject challenges the district court's order of disposition on two grounds—both based upon the court's determination of the "[l]east restrictive alternative."[2] He claims that an alternative plan was less restrictive and that the court improperly added conditions to the department's plan. After establishing the standard of review, we find no error appearing on the record in the court's approval of the department's treatment plan with the additional restrictions. We affirm.

## BACKGROUND

### Initial Determination

The State filed a petition under the DDCCA for court-ordered custody of T.W., an adult male. It had the burden to prove by clear and convincing evidence that T.W. was a person in need of court-ordered custody and treatment.[3] Following a hearing, the district court found by clear and convincing evidence that T.W. was a person with a developmental disability, that he presented an ongoing threat of harm to others, and that he needed court-ordered custody and treatment. Those determinations are not at issue on appeal.

---

[1] See Neb. Rev. Stat. §§ 71-1101 to 71-1134 (Reissue 2018).

[2] See § 71-1109.

[3] See § 71-1124.

After finding that T.W. was a person in need of court-ordered custody and treatment and in accordance with § 71-1124, the court ordered the Nebraska Department of Health and Human Services (DHHS) to prepare a written custody and treatment plan. Section 71-1124 specifies that the plan for custody and treatment submitted by DHHS should be in the least restrictive alternative. After receipt of DHHS' plan, the court set the matter for a dispositional hearing.[4]

### Dispositional Hearing

At the dispositional hearing, two licensed psychologists who evaluated T.W. testified. Dr. Tessa Svoboda evaluated T.W. on behalf of DHHS, and Dr. David Mitchell performed an evaluation at the request of T.W.'s attorney. The court received their respective evaluations into evidence.

Testimony established that there are essentially three placement options for developmentally disabled individuals in Nebraska. One is "supported family," which involves intermittent staffing in the family home. Staff can be present for no more than 70 hours per week and only when the subject is awake. DHHS would not be able to accurately monitor subjects provided with intermittent family support staff.

Another option is a group home setting. With that option, three or four subjects needing services live together in a home and staff work rotating shifts. There is 24-hour supervision.

The third option is a "shared living provider." In that setting, the subject moves into the home of a staff member. There are consistent staff members who are able to monitor and track behaviors and habilitation. Because of the "one-on-one supervision," staff can monitor any usage or restrictions set by the court.

Svoboda explained that a shared living provider has certain certifications and licenses and receives training in several areas. Such a provider also has access to a computer system

---

[4] *Id.*

used by the State to document all records for individuals receiving developmental disability services. With access to that system, DHHS can monitor and enforce court orders in a shared living provider environment. A shared living provider is required to enter medication entries, significant medical or behavioral events, programming, and how the provider is trying to consistently respond to problematic behavior. T.W.'s mother would not be required to document such information.

The report Svoboda prepared on DHHS' behalf stated that the least restrictive alternative would be in a shared living provider environment with no other participants residing in the home. DHHS' plan recommended "24/7" supervision at all times. It further recommended that T.W. be directly supervised during all electronic or telephonic communications and while accessing the internet. At the hearing, the State did not advocate for additional restrictions.

Svoboda determined that without supervision, T.W. could be a high risk for reoffending. She believed that T.W. would have a fairly high probability of reoffending if he remained in his home with the same level of supervision. Svoboda did not believe that intermittent family living support would be sufficient to protect the community from reoffense by T.W.

In preparing DHHS' plan for T.W., Svoboda was aware that T.W. had resided in his mother's home for approximately 1 year after the allegations in this case were made. To Svoboda's knowledge, no further wrongful act had occurred during that year. But Svoboda pointed out that safeguards were implemented. The safeguards included visual supervision, especially outside the home, and an ankle monitor to track movements. Svoboda learned that T.W. figured out how to bypass safeguards that were put on his cell phone to prohibit access to certain websites.

Svoboda did not believe a group home setting would be appropriate for T.W. One problem was that other vulnerable individuals may be in the home. Another drawback was that

varying staff made it more difficult "to maintain consistency in running behavior or habilitation programs with a staff."

Mitchell opined that T.W. could continue living at home with his mother, but Mitchell recommended "24/7" supervision. Mitchell was unsure if T.W.'s mother was available at home 24/7, and he cautioned that the 24/7 supervision needed by T.W. may become difficult to maintain. To Mitchell's knowledge, T.W. had been "cooperative with his ankle monitor."

According to Mitchell, the "bottom line" was that someone needed to watch T.W. He explained: "[I]f that can be done in the home environment, I think that that's okay. If that's not able to be done, then, probably a living environment where there's staff around that can certainly provide 24 hour — 24/7 supervision would also be appropriate." Mitchell testified that he was "not totally familiar with what [a shared living provider] might offer." But he testified that if a shared living provider where T.W. was the only person receiving services in the home were available, that setting would be appropriate for T.W.

Mitchell's evaluation provided additional insight. It stated that if T.W. "demonstrated additional behaviors related to sexual interest in children, a more supervised and restrictive setting, such as a therapeutic group home, would be appropriate." It further stated that T.W. "should continue to comply with any and all restrictions/guidelines given to him by the court and/or probation."

## Order of Disposition

Following a hearing, the court entered an order of disposition (styled as a placement order). It adopted DHHS' treatment plan, finding that it was the least restrictive option to protect T.W.'s rights and to protect society. Thus, the court placed T.W. with a shared living provider to provide one-to-one supervision.

The court added restrictions not included in DHHS' recommendations. The court's order stated that T.W. "is not to

have internet access on any device, including but not limited to a cell phone, desktop computer, laptop computer, television, or gaming system." It further directed the sheriff's department "to place an ankle-fastened Global Positioning System monitor on [T.W.] to be worn at all times unless modified by Court Order." The court placed T.W. in DHHS' custody and set the matter for an annual review in August 2023.

T.W. filed a timely appeal, which we moved to our docket.[5]

## ASSIGNMENTS OF ERROR

T.W. assigns that the court erred (1) by approving a plan that was not the least restrictive alternative and (2) by adding conditions to his placement that were not part of the plan offered by the State.

## STANDARD OF REVIEW

The standard of appellate review for a district court's final decision under the DDCCA presents an issue of first impression. Appeals involving the DDCCA have come before this court twice.[6] Because in one case we determined that we lacked jurisdiction[7] and in the other case we addressed only a question of constitutionality,[8] we did not articulate the standard of review that applies when analyzing the merits of a district court's judgment or final order under the DDCCA. Here, we must do so.

T.W. urges a particular standard of review. T.W. suggests that because the statutes in the DDCCA are similar to those in the Nebraska Mental Health Commitment Act (MHCA),[9] this court should review the matter similar to the way a district

---

[5] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2022).

[6] See, *In re Interest of K.C.*, 313 Neb. 385, 984 N.W.2d 277 (2023); *In re Interest of C.R.*, 281 Neb. 75, 793 N.W.2d 330 (2011).

[7] *In re Interest of K.C., supra* note 6.

[8] *In re Interest of C.R., supra* note 6.

[9] See Neb. Rev. Stat. §§ 71-901 to 71-963 (Reissue 2018).

court reviews a determination by a mental health board. The district court reviews the determination of a mental health board de novo on the record.[10] Citing this standard, T.W. believes that we should review the district court's determination de novo on the record. The State's brief did not propose a scope of appellate court review; at oral argument, counsel advocated for a clearly erroneous standard.

But we are not persuaded that the MHCA's standard applies to the DDCCA. At the outset, it is important to point out that the MHCA is a separate statutory scheme with its own procedure, including a specific standard of appellate review. The hearing to determine whether there is clear and convincing evidence that a subject is mentally ill and dangerous takes place before a mental health board.[11] The board determines the appropriate treatment order.[12] The treatment order may be appealed, and a district court reviews the appeal de novo on the record.[13] Section 71-930 specifically provides that "[a] final order of the district court may be appealed to the Court of Appeals in accordance with the procedure in criminal cases."

We used the language of § 71-930 to determine the standard of appellate review for a district court's order under the MHCA in *Hill v. County Board of Mental Health*.[14] There, we looked to our standard of review in a recent criminal case where we stated that "[t]his court will not interfere on appeal with a conviction based upon evidence unless it is so lacking in probative force that the court can say as a matter of law that it is insufficient to support a verdict of guilt beyond

---

[10] *In re Interest of S.J.*, 283 Neb. 507, 810 N.W.2d 720 (2012).

[11] § 71-924.

[12] § 71-925.

[13] § 71-930.

[14] *Hill v. County Board of Mental Health*, 203 Neb. 610, 279 N.W.2d 838 (1979).

a reasonable doubt."[15] In *Hill*, we borrowed that standard but adjusted the burden of proof from beyond a reasonable doubt—the standard of proof in a criminal case[16]—to clear and convincing evidence—the standard of proof required by the MHCA.[17] We announced, "[T]his court will not interfere on appeal with a final order made by the District Court in a mental health commitment proceeding as provided by [the MHCA], unless this court can say as a matter of law that it is not supported by clear and convincing proof."[18]

In determining whether the MHCA standard of review should apply here, we are mindful that the MHCA differs from the DDCCA in significant ways. The MHCA has a mental health board to make initial determinations; the DDCCA has no similar tribunal inferior to the district court. Under the MHCA, an appeal from the mental health board's decision may be taken to the district court, which reviews the case de novo on the record. But under the DDCCA, the district court makes the initial determinations; it does not act in a reviewing capacity. And unlike the MHCA, the DDCCA does not prescribe a standard of appellate review or rely on the procedure for appeals in criminal cases. Instead, the DDCCA simply states that the subject of a petition has the right "to appeal a final decision of the court."[19] These differences make it inappropriate to engraft the MHCA's standard of review into a DDCCA appeal.

We recognize that two statutes in chapter 25, article 19, of the Nebraska Revised Statutes set forth a scope of review

---

[15] *State v. Sommers*, 201 Neb. 809, 818, 272 N.W.2d 367, 372 (1978), *disapproved on other grounds, State v. Irish*, 292 Neb. 513, 873 N.W.2d 161 (2016).

[16] See *State v. Mann*, 302 Neb. 804, 925 N.W.2d 324 (2019).

[17] See §§ 71-924, 71-925, 71-938, 71-956, and 71-963.

[18] *Hill v. County Board of Mental Health, supra* note 14, 203 Neb. at 612, 279 N.W.2d at 839.

[19] § 71-1118(8).

for an appeal from the district court in a civil case. One, Neb. Rev. Stat. § 25-1911 (Reissue 2016), states that "[a] judgment rendered or final order made by the district court may be reversed, vacated, or modified for errors appearing on the record." The other, Neb. Rev. Stat. § 25-1925 (Reissue 2016), provides that "[i]n all appeals from the district court in suits in equity," the appellate court shall "retry the issue or issues of fact involved in the finding or findings of fact complained of upon the evidence preserved in the bill of exceptions and, upon trial de novo of such question or questions of fact, reach an independent conclusion."

Because the DDCCA does not specify a particular standard of appellate review, we consider the potential applicability of the scope in either § 25-1911 or § 25-1925. A proceeding for civil commitment of a person by reason of developmental disability was not historically understood to be a suit in equity, but, rather, was statutory in nature.[20] Thus, the de novo standard in § 25-1925 for appeals in suits in equity is not applicable. That leaves only the general standard of review for an appeal from a judgment or final order made by the district court, which is prescribed by § 25-1911.

[1,2] We hold that in an appeal under the DDCCA, an appellate court reviews a district court's judgment or final order for errors appearing on the record. When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[21]

---

[20] See, generally, 56 C.J.S. *Mental Health* §§ 45 and 49 (2018); Valerie L. Collins, *Camouflaged Legitimacy: Civil Commitment, Property Rights, and Legal Isolation*, 52 How. L.J. 407 (2009); Ronnie Hall, *In the Shadowlands:* Fisher *and the Outpatient Civil Commitment of "Sexually Violent Predators" in Texas*, 13 Tex. Wesleyan L. Rev. 175 (2006).

[21] *In re Adoption of Faith F.*, 313 Neb. 491, 984 N.W.2d 640 (2023); *Schaefer Shapiro v. Ball*, 305 Neb. 669, 941 N.W.2d 755 (2020).

[3] Whether a decision conforms to law and the interpretation of statutes present questions of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court.[22]

[4] An appellate court, in reviewing a district court judgment for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings.[23]

## ANALYSIS

Having settled the standard of review, we briefly discuss appellate jurisdiction before turning to the merits.

### Appellate Jurisdiction

[5] Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it, and this is so even where neither party has raised the issue.[24] Although the parties do not contest our appellate jurisdiction, the appealability of a dispositional order under the DDCCA is an issue of first impression and deserves discussion.

[6] The DDCCA provides that the subject of a petition has the right "to appeal a final decision of the court."[25] We recently read this provision "as incorporating the rules of appealability in civil matters, including § 25-1902."[26] One rule of appealability in civil matters is that for an appellate court to acquire jurisdiction of an appeal, the party must be appealing from a final order or a judgment.[27] And under Neb.

---

[22] *Gelco Fleet Trust v. Nebraska Dept. of Rev.*, 312 Neb. 49, 978 N.W.2d 12 (2022).

[23] *Pinnacle Bancorp v. Moritz*, 313 Neb. 906, 987 N.W.2d 277 (2023).

[24] *In re Interest of K.C., supra* note 6.

[25] § 71-1118(8).

[26] *In re Interest of K.C., supra* note 6, 313 Neb. at 393, 984 N.W.2d at 282.

[27] *In re Interest of K.C., supra* note 6.

Rev. Stat. § 25-1902 (Cum. Supp. 2022), the four types of final orders which may be reviewed on appeal are (1) an order affecting a substantial right in an action, when such order in effect determines the action and prevents a judgment; (2) an order affecting a substantial right made during a special proceeding; (3) an order affecting a substantial right made on summary application in an action after a judgment is entered; and (4) an order denying a motion for summary judgment when such motion is based on the assertion of sovereign immunity or the immunity of a government official.[28]

[7] Here, T.W. appealed from the order of disposition. Because we have previously stated that a proceeding involving involuntary commitment is a special proceeding for appellate purposes,[29] we turn our focus to whether the order affected a substantial right.

According to our jurisprudence in the context of involuntary commitment proceedings under different legislative acts, jurisdiction turned on whether the order appealed from deprived the individual of his or her liberty for an indeterminate period of time.[30] We believe a similar result should follow under the DDCCA.

[8] We hold that an order of disposition under the DDCCA that deprives a subject of his or her liberty for an indeterminate period of time affects a substantial right. Because the order of disposition deprived T.W. of his liberty for an indeterminate period of time, it affected a substantial right. And because the order was made during a special proceeding, it is a final order that may be appealed.

Having established the appropriate standard of review and that jurisdiction is proper, we turn to the merits of T.W.'s two assigned errors.

---

[28] *Id.*

[29] See *id.*

[30] See *id.*

## LEAST RESTRICTIVE ALTERNATIVE

First, T.W. argues that to the extent the court approved DHHS' plan, it erred by approving a plan that was not the least restrictive alternative. In this regard, he contends that Mitchell's alternative plan was the appropriate least restrictive alternative and that thus, the shared living provider arrangement in DHHS' plan was unnecessarily restrictive. Before considering the appropriateness of Mitchell's plan, we discuss the DDCCA's least restrictive alternative requirement.

In the DDCCA, the Legislature explicitly recognized the right of individuals with developmental disabilities to enjoy personal liberty and freedom.[31] But it also acknowledged that in some instances, a court needs to balance that right with the interests of society and place the individual's care and custody with the State for appropriate treatment and services.[32]

In balancing these interests, the concept of the least restrictive alternative is key. The DDCCA defines "[l]east restrictive alternative" to mean "a placement and services provided in a manner no more restrictive of a subject's liberty and no more intrusive than necessary to provide appropriate treatment and protect society."[33] The DDCCA directs that DHHS' plan for custody and treatment be in the least restrictive alternative.[34] It also specifies that DHHS' plan shall include "appropriate terms and conditions to provide custody and treatment of the subject in the least restrictive alternative."[35] And under § 71-1126, the court shall approve DHHS' plan "unless it is shown by a preponderance of the evidence that the plan is not the least restrictive alternative for the subject."

[9] The issue here is whether a preponderance of the evidence showed that DHHS' plan for a shared living provider

---

[31] § 71-1102.

[32] *Id.*

[33] § 71-1109.

[34] § 71-1124.

[35] § 71-1125.

was not the least restrictive alternative. A "preponderance of the evidence" is the equivalent of the greater weight of the evidence.[36] The greater weight of the evidence means evidence sufficient to make a claim more likely true than not true.[37] T.W. contends that the plan prepared by Mitchell—which recommended that T.W. remain in his mother's home—was less restrictive than DHHS' plan.

Although Mitchell's plan was less restrictive, the district court implicitly found that Mitchell's plan did not provide the necessary treatment and did not adequately protect society. Under our standard of review, we will not substitute our own factual findings where competent evidence supports the district court's findings.

In this regard, competent evidence supported those findings. According to testimony during the initial hearing, T.W. was supposed to have "100-percent supervision." His mother paid an individual to watch him so she could work. But when that individual failed to provide supervision, T.W. sexually assaulted a child. Testimony during the disposition hearing established that if T.W. remained in his mother's home, DHHS would not know, outside of the 70 hours per week when it could provide supported family living service, if T.W. were using the internet, viewing pornography, attempting to have contact with children, or doing anything that a court ordered him not to do.

Also problematic was the level of supervision that T.W. needed. Svoboda and Mitchell agreed that T.W. needed 24/7 supervision, and Mitchell called it the "bottom line." But Mitchell's testimony cast doubt on whether that was possible in T.W.'s home. He was unsure if T.W.'s mother could provide such supervision. And Mitchell testified that if someone were not available in the home to watch T.W., then T.W.

---

[36] See *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020).

[37] *Id.*

would need a living environment where staff could provide 24/7 supervision. Such supervision is available with a shared living provider.

[10-12] The district court, as the finder of fact, was empowered to accept or reject competing expert testimony. Testimony of expert witnesses is not treated any differently in the factfinding process than that of witnesses generally when it comes to determining the weight and credibility of the testimony.[38] A trier of fact is not bound to accept expert opinion testimony.[39] The credibility of a witness is a question for the trier of fact, and it is within its province to credit the whole of the witness' testimony, or any part of it, which seemed to it to be convincing, and reject so much of it as in its judgment is not entitled to credit.[40]

Under § 71-1126, the court shall approve DHHS' plan "unless it is shown by [the greater weight] of the evidence that the plan is not the least restrictive alternative for the subject." Here, the court implicitly found that as to T.W.'s evidence for supported family placement, T.W. failed to meet that burden. Competent evidence supported that finding. The court explicitly found DHHS' plan was the "least restrictive option to protect [T.W.'s] rights and to protect society." Once again, the record contained competent supporting evidence.

To the extent the court's order rejected Mitchell's plan and instead approved DHHS' plan, the order conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable. T.W.'s first assignment of error lacks merit.

### Additional Conditions

Second, T.W. claims that the court improperly imposed two particular conditions above and beyond those recommended

---

[38] *Doyle v. Union Ins. Co.*, 202 Neb. 599, 277 N.W.2d 36 (1979).

[39] *Benjamin v. Bierman*, 305 Neb. 879, 943 N.W.2d 283 (2020).

[40] *Id*.

by DHHS. DHHS' plan recommended such conditions as 24/7 supervision, alarms or chimes on all doors and windows to alert staff to elopement attempts, and direct supervision of T.W. while he accessed the internet. Though not part of DHHS' plan that the court adopted, the court sua sponte added conditions of "Global Positioning System" monitoring and no internet access. In determining whether the plan submitted by DHHS can be changed to make it more restrictive, we turn to principles of statutory interpretation.

[13-15] The fundamental objective of statutory interpretation is to ascertain and carry out the Legislature's intent.[41] Statutes pertaining to the same subject matter should be construed together; such statutes, being in pari materia, must be construed as if they were one law and effect given to every provision.[42] In construing a statute, the legislative intention is to be determined from a general consideration of the whole act with reference to the subject matter to which it applies and the particular topic under which the language in question is found, and the intent as deduced from the whole will prevail over that of a particular part considered separately.[43]

The DDCCA's statutory framework does not explicitly contemplate that a district court might need to make DHHS' plan *more* restrictive. A common theme in the DDCCA is that DHHS' plan be the least restrictive alternative.[44] If evidence shows that it is not, the court shall not approve the plan.[45] Thus, the statutory scheme seems to envision that the State's interests normally would be fully reflected by the State's evaluation and proposed treatment plan.

---

[41] *Porter v. Knife River, Inc.*, 310 Neb. 946, 970 N.W.2d 104 (2022).

[42] *Wahlers v. Frye*, 205 Neb. 399, 288 N.W.2d 29 (1980).

[43] *132 Ventures v. Active Spine Physical Therapy*, 313 Neb. 45, 982 N.W.2d 778 (2022).

[44] See §§ 71-1124, 71-1125, and 71-1126.

[45] See § 71-1126.

[16,17] But we do not read the statute to designate DHHS' plan as a "ceiling" in all circumstances and to preclude the State from proving that greater restrictions were necessary to establish the least restrictive alternative. Such a reading would impose upon the judicial department an opinion of an expert representing the executive department. Nebraska's separation of powers clause prohibits the three governmental branches from exercising the duties and prerogatives of another branch.[46] Where a statute is susceptible of two constructions, under one of which the statute is valid while under the other it is unconstitutional or of doubtful validity, that construction which gives it validity should be adopted.[47]

Here, an alternative reading avoids this problem. Under § 71-1126, the court is to consider not just the plan, but also "the arguments of the parties, and any other relevant evidence," and to approve the plan "unless it is shown by a preponderance of the evidence that the plan is not the least restrictive alternative for the subject." In addition, § 71-1126 mandates that the order of disposition "set[] forth *the treatment plan* for the subject." (Emphasis supplied.) This language distinguishes the *court's* treatment plan from the *department's* proposed plan. We read these provisions to mean that the State could show, or the district court could otherwise independently conclude, by the greater weight of the evidence that more restrictions were necessary to achieve the least restrictive alternative. Whether the evidence does so is entrusted initially to the district court. We review the court's decision under our standard for errors appearing on the record.

We consider the two ways in which the court's order differed from the plan.

First, the court had evidence of T.W.'s circumvention of technological restrictions. Svoboda testified that T.W. was

---

[46] *Adams v. State*, 293 Neb. 612, 879 N.W.2d 18 (2016).

[47] *Nebraska Pub. Serv. Comm. v. Nebraska Pub. Power Dist.*, 256 Neb. 479, 590 N.W.2d 840 (1999).

able to bypass safeguards that had been put on his cell phone to keep him from accessing certain websites. From this evidence, the court could reasonably infer that mere supervision may not be sufficient to prevent harm to the public and that only a ban on internet usage would suffice.

Second, while DHHS' plan called for 24/7 supervision outside the shared living provider's residence, the court had evidence that T.W. had been living with his mother for approximately 1 year since the allegations of sexual assault, that he had been wearing an ankle monitor to track his movements, and that no further acts had occurred. From this evidence, the court could reasonably infer that the ankle monitor required at the earlier stage had protected the public where other attempts of supervision had failed.

Based on this evidence and these inferences, the district court could reasonably conclude that the greater weight of the evidence showed that the additional restrictions were necessary to achieve the least restrictive alternative. The court implicitly found that without the additional restrictions, DHHS' plan was not the least restrictive alternative. We recognize that the court could have rendered an order with greater specificity regarding its findings. But a fair reading of the order dictates that it must have concluded that the State met its burden to show, by the greater weight of the evidence, DHHS' plan, as modified by the court, was the least restrictive alternative.

Therefore, we find no merit to T.W.'s second assignment of error. In other words, we find no error appearing on the record regarding the imposition of additional conditions in the court's order of disposition.

## CONCLUSION

In this appeal under the DDCCA, we review the district court's judgment or final order for errors appearing on the record. T.W. attacked two aspects of the district court's order of disposition—rejection of his plan for home supervision

and imposition of additional conditions. We conclude that the court's order, including the two added conditions, conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable. We therefore affirm the court's final order.

AFFIRMED.

MILLER-LERMAN, J., concurring.

I agree with the majority that the appellate standard of review is for errors appearing on the record. I further agree that under the relevant statutes, Neb. Rev. Stat. §§ 71-1101 to 71-1134 (Reissue 2018), the district court is not limited to the plan submitted by the Department of Health and Human Services and can modify the terms of the treatment plan. However, the additional terms need to be supported by sufficient evidence.

In this case, the opinion of the majority that the district court's total ban on usage of the internet and the requirement of an ankle monitor were inferentially necessary to achieve the least restrictive conditions. However laudatory these additional conditions may be, I do not believe they are supported by competent evidence that the conditions are necessary to implement the least restrictive alternative. And it necessarily follows that the imposition of greater restrictions without sufficient supporting evidence does not conform to the law. Accordingly, I would modify the condition that prohibits all internet access for any purpose and would replace it with DHHS' recommendation that T.W. must "be directly supervised during all electronic and/or telephonic communications, as well as while he is accessing the internet." And I would remove altogether the requirement that T.W. wear an ankle monitor at all times. As so modified, I would affirm the order of the district court.

STACY and PAPIK, JJ., join in this concurrence.