Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
12/05/2025 09:11 AM CST

In re Interest of M.S., alleged to be a
mentally ill and dangerous person.
M.S., appellant, v. Mental Health Board of
the Fourth Judicial District, appellee.

___ N.W.3d ___

Filed December 5, 2025.    No. S-25-046.

1. **Mental Health: Judgments: Appeal and Error.** The district court
reviews the determination of a mental health board de novo on the
record. In reviewing a district court's judgment, an appellate court will
affirm unless it finds, as a matter of law, that clear and convincing evidence does not support the judgment.

2. **Judgments: Statutes: Appeal and Error.** Whether a decision conforms
to law and the interpretation of statutes present questions of law, in connection with which an appellate court reaches a conclusion independent
of that reached by the lower court.

3. **Rules of Evidence: Appeal and Error.** When judicial discretion is not
a factor, whether the underlying facts satisfy the legal rules governing
the admissibility of a proponent's evidence is a question of law, subject
to de novo review.

4. **Constitutional Law: Pretrial Procedure.** Confrontation Clause rights
are trial rights that do not extend to pretrial hearings in state proceedings.

5. **Constitutional Law: Mental Health: Pretrial Procedure.** The confrontation rights set forth in Neb. Rev. Stat. § 71-954 (Reissue 2018)
are trial rights that do not extend to pretrial hearings in mental health
commitment proceedings.

6. **Rules of Evidence: Hearsay.** A declarant's out-of-court statement
offered for the truth of the matter asserted is inadmissible unless it falls
within a definitional exclusion or statutory exception.

7. **Criminal Law: Mental Health.** In determining whether a person is
dangerous, the focus must be on the person's condition at the time of
the hearing.

8. **Mental Health: Other Acts: Proof.** Actions and statements of a person alleged to be mentally ill and dangerous which occur before the hearing are probative of the subject's present mental condition. But, for a past act to have evidentiary value, the past act must have some foundation for a prediction of future dangerousness, thus being probative of that issue.

Appeal from the District Court for Douglas County: James M. Masteller, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Emma J. Lindemeier for appellant.

Jameson D. Cantwell, Deputy Douglas County Attorney, for appellee.

Funke, C.J., Miller-Lerman, Cassel, Stacy, Papik, Freudenberg, and Bergevin, JJ.

Papik, J.

Following a hearing, the Mental Health Board of the Fourth Judicial District (Board) ordered that M.S. be committed for mental health treatment under the Nebraska Mental Health Commitment Act. See Neb. Rev. Stat. §§ 71-901 to 71-963 (Reissue 2018). The district court affirmed that order, and M.S. now appeals to us. M.S. claims that the Board violated her confrontation rights under § 71-954 and received inadmissible hearsay over her objections. She also contends that the evidence was not sufficient to support commitment. Finding no merit to the errors M.S. assigns, we affirm.

## I. BACKGROUND

### 1. State Petitions Board for Mental Health Commitment

In May 2024, the State, represented by the county attorney, filed a petition alleging M.S. to be a mentally ill and dangerous person under § 71-908. Attached to and referenced in the petition was intake information provided by M.S.' daughter.

According to that information, M.S. was a former law enforcement officer and owned a handgun. M.S.' daughter reported that M.S. had a history of mental illness and was not taking any medication. The daughter's intake information recited that M.S. had come to the daughter's house unexpectedly one morning. M.S. asked if everything was "okay" and said she had a gun. The daughter assured M.S. that she was fine and left for work. At about 10 a.m., the daughter received a notification from her video doorbell camera that showed M.S. kicking at the daughter's back door. The daughter related that during her interactions with M.S. that day, M.S. seemed "out of touch with reality." More details from the intake information are supplied below.

Based on the information provided by M.S.' daughter, the State alleged that there were no alternatives less restrictive than inpatient hospitalization to prevent the harm described in § 71-908. The Board later determined there was probable cause to believe that M.S. was mentally ill and dangerous and ordered that M.S. should have psychiatric care and treatment pending further order of the Board. As a result, M.S. was admitted to a psychiatric facility to await commitment proceedings, and she was appointed counsel.

## 2. Board Overrules M.S.' Motion to Continue

The Board initiated a hearing on the petition about 2 weeks after it was filed, with three Board members present. M.S. moved for a 90-day continuance, asserting that she had complied with the treatment plan. Before proceeding to the hearing on the petition, the Board conducted a hearing on M.S.' motion to continue.

Dr. Sidney Kauzlarich, a psychiatrist licensed to practice medicine in Nebraska and the medical director at Douglas County Community Health Center, testified for the State. Prior to M.S.' admission there in May 2024, Kauzlarich had treated M.S. on an outpatient basis since 2022. In 2022,

she was diagnosed with major depressive disorder with psychotic features.

Kauzlarich opined that a 90-day continuance would be inconsistent with the level of care M.S. needed, even though she was complying with treatment. He explained that based on his experience treating M.S., he believed she could be compliant but that when she would become "ill," she lacked the insight to voluntarily seek treatment.

In addition to the level of care, Kauzlarich testified to "other issues" weighing against a continuance. He observed that M.S. owned firearms, and a mental health commitment "would take the gun out of her hand."

When the State asked Kauzlarich about specific statements made by M.S.' family members, M.S. objected on hearsay grounds. Without ruling on the hearsay objection, the chairperson stated that the Board had "heard enough" and overruled M.S.' motion to continue. There is no indication on the record that the Board voted on the motion to continue or that M.S. was given the opportunity to cross-examine Kauzlarich.

The Board immediately proceeded with the hearing on the State's petition.

### 3. Board Holds Hearing on Petition

The hearing on the petition then commenced. The Board heard testimony by Kauzlarich, M.S.' daughter, and M.S. Among other documents, the Board received the petition and Kauzlarich's treatment plan in evidence.

### (a) Kauzlarich's Testimony

Kauzlarich testified that he was M.S.' attending physician during her prior hospitalization in 2022, when she was first diagnosed with major depressive disorder with psychotic features. He stated that M.S. was very paranoid then and made suicidal statements. Kauzlarich testified that at that time, M.S. agreed to begin treatment with antidepressant and antipsychotic medications, and he recalled that M.S. had improved. In August 2022, M.S. told Kauzlarich that she had side effects

from the antipsychotic medication, and she stopped taking it. Kauzlarich testified that for a time afterward, M.S. reported she was doing fine, and that she was cooperative and attended her appointments.

But in March 2024, Kauzlarich became "very concerned" because M.S. had missed some appointments after losing her insurance, and when she did come in for an appointment, she told Kauzlarich that she was no longer taking her medication. Kauzlarich testified that he did not prescribe M.S. medication at that point because she did not want to take it and there was no evidence that she was an imminent danger to herself or others. Kauzlarich advised M.S. to contact him if she had any problems or concerns before her 3-month followup appointment, but she did not.

In May 2024, after M.S. was hospitalized based on events from the most recent petition, Kauzlarich met with her and conducted a mental status examination. Kauzlarich observed M.S. to be persistently irritable, argumentative, guarded with information, and suspicious about the motives of her family. After that evaluation, Kauzlarich met with M.S. every weekday and observed that M.S. had acquiesced to taking medication and was following a treatment plan, but Kauzlarich testified that she remained guarded with information and minimized her symptoms and paranoia.

To formulate a diagnosis and treatment plan, Kauzlarich obtained additional information from M.S.' children. He explained that this was important because he could not always get accurate details from a client who is psychotic or guarded, and family members had valuable information because they spent more time with the client than Kauzlarich did. Over M.S.' hearsay objection, Kauzlarich testified that M.S.' children expressed concerns that outside of the hospital, M.S. had become more isolative and more paranoid, and that they had become fearful of M.S. Kauzlarich further testified that M.S.' daughter provided information that was similar to the information in the petition: that M.S. appeared at her

daughter's home concerned for her daughter's safety, that M.S. said she had brought a gun, that her daughter said she was fine, and that M.S. returned to her daughter's home and was kicking at the door and stating "[s]omething big" was about to happen because "Kelso" was removed from the FBI. Additionally, Kauzlarich testified that M.S.' son was concerned for his safety and feared retaliation and that the son mentioned M.S. had been paranoid for quite some time and was covering up her symptoms during the time Kauzlarich worked with M.S.

Over M.S.' foundation objection, Kauzlarich testified that M.S. was diagnosed with bipolar I disorder, manic episode with psychotic features, and that she has a history of generalized anxiety disorder and major depressive disorder. When asked what behaviors M.S. exhibited that supported this diagnosis, Kauzlarich replied:

I think the persisting irritability, the constant irritability, the low-frustration tolerance. And when you go back and look at some of the notes she talks about when I get anxious, I have increased energy, I have got to be doing something. Increased activity levels. And then the paranoia. Just flat out, you know, the paranoia. You know, being mistrusting. Being argumentative. Being concerned about the safety of others without any reason. Making some statements that sound paranoid. You know, like Kelso was removed from the FBI. Something big is going to happen. And then her guardedness. Her unwillingness to just come out and say what is going on, even on the psych testing.

Kauzlarich explained, without objection, that objective psychological testing confirmed that M.S. was concealing her symptoms. Kauzlarich noted that "Dr. Gillespie," who Kauzlarich worked with as a "team member" in assessing and treating M.S., performed testing on M.S. and that the testing was part of M.S.' medical records. When Kauzlarich was asked about the results of the testing, M.S. objected based on

hearsay, and the objection was overruled. Kauzlarich testi-
fied that the results indicated that M.S. can "present very well
while still being very ill." For example, the results showed
that M.S. "had significant difficulty admitting to minor faults
or foibles. Let alone acknowledging symptoms of significant
impairment." Kauzlarich testified the "[v]ery high levels of
intentional defensiveness and denial" made "a firm diagnostic
conclusion impossible given these particular results."

Kauzlarich opined that M.S. could be a danger to herself
and to others. He explained that risk factors included the inci-
dent of M.S.' bringing a gun to her daughter's home and M.S.'
failure to seek care when she "ended up more psychotic" after
the cessation of medication and therapy. But he denied that
during M.S.' most recent hospitalization she had threatened
to harm herself or others. Kauzlarich acknowledged that M.S.
was amenable to giving up her firearms, but he advocated for a
commitment to ensure that she could not own any.

Kauzlarich testified that he was before the Board to recom-
mend a treatment plan. Without objection, the Board received
Kauzlarich's treatment plan, which identified M.S.' diagnosis
as bipolar I disorder, manic with psychosis. His treatment plan
for M.S. included inpatient and outpatient treatment, with
therapy and forced medication for psychosis in the form of
a long-acting injectable. Kauzlarich characterized this as
the least restrictive option based on M.S.' history of miss-
ing scheduled appointments and discontinuing medication.
Kauzlarich acknowledged that this history may have stemmed
from M.S.' illness or may have been due to her loss of insur-
ance. Kauzlarich stated that at the time of the hearing, M.S.
was voluntarily engaged in the treatment plan. He testified that
when he informed M.S. that the treatment plan included an
antipsychotic medication, she initially said she did not want to
take it due to previous side effects. However, after obtaining a
second opinion from a provider who agreed M.S. was bipolar,
manic, and psychotic, M.S. submitted to the medication and

had taken it orally for 2 weeks, followed by one dose in the form of a monthly long-acting injectable.

Kauzlarich testified that for M.S. to be discharged, she would need to give up her firearms and have an outpatient provider in place to continue her care. Kauzlarich's treatment plan provided:

Hospital Treatment Plan[:]

1. Patient will continue to stabilize on inpatient unit.

2. Patient will take all medications as prescribed, including short term and long term injectables, to effectively manage psychiatric symptoms, and those may be forced against patient's will, if necessary, on both an inpatient and outpatient basis.

3. Patient will be referred to wraparound psychiatric outpatient services in the community . . . .

. . . .

Proposed post-hospitalization treatment plan in the least restrictive environment:

1. Patient will follow up with outpatient provider, attend all scheduled appointments and take all medications as prescribed.

2. Patient will reside at a facility/shelter determined to be appropriate at time of discharge.

(b) Testimony by M.S.' Daughter

M.S.' daughter described her relationship with M.S. as "good." She recalled that in the summer of 2022, she pursued a mental health commitment of M.S. M.S. was hospitalized at that time, but she was not committed because the petition was denied. The daughter testified that after this hospitalization, M.S. did "pretty well" at first. But during the next year or so, M.S. alternated between spending time with family members and acting distant and not answering or returning their calls. In February 2024, M.S. called her daughter to say M.S. was staying at a hotel because she felt her own house was evil. The daughter testified that she offered for M.S. to stay at the

daughter's house. M.S. initially said she would, but, the daughter testified, "One of our boundaries was she couldn't bring her firearm into our house. And she had stated, never mind. I'll just stay at home."

The daughter also testified about her interactions with M.S. that led to M.S.' most recent hospitalization. She summarized those interactions in the intake information, which was attached to the petition and received in evidence. The daughter recalled that one day in May 2024, at around 7:30 a.m., she was at her house and getting ready for work when she heard the doorbell ring. It was M.S., wearing a cross-body handbag. According to the daughter, M.S. said that she had just tried to call the daughter and asked if someone was there. M.S. told the daughter she had a gun with her and put her hand on the handbag. The daughter assured M.S. that no one was in the home and that she was fine. The daughter testified that M.S. eventually left and the daughter went to work. At about 10 a.m., the daughter received a notification from her video doorbell camera that showed M.S. kicking at her back door. Video footage from the doorbell camera then showed M.S. go to the front door and yell, "Valerie [(the daughter's neighbor)], where are my kids? Where is my daughter and daughter-in-law?" The daughter testified that she then called M.S. and that during the conversation, M.S. said something about the FBI and that "someone by the name of Kelso was let go." According to the daughter, M.S. also said, "There's something big going to happen. We need to bust this thing wide open." The daughter testified that M.S. kicked at the door to her house and stated that she would kick the door in if she had to.

The daughter testified that the incident in May 2024 made her concerned about the safety of M.S. and of others around M.S., especially the daughter's neighbor and M.S.' son, who was "keeping" M.S.' guns from her. In the intake information recounting the May 2024 incident, the daughter reported that M.S seemed "out of touch with reality" and "unpredict[able]" and that the daughter was "very concerned [M.S.] has [a] gun

while under this state" and "went as far as to kick at our back door." The daughter's intake information requested that M.S. be admitted and evaluated "[f]or the safety of others."

The daughter testified before the Board that in response to the May 2024 incident, she tried to contact Kauzlarich, not law enforcement. The daughter denied ever seeing a gun during the two interactions that day; she also denied that M.S. threatened to harm her or herself, and she denied that M.S. explicitly threatened to harm anyone else.

When asked whether M.S. could mask her symptoms, the daughter replied that in January and February 2024, the daughter thought "something seemed off" or "things might not be okay" with M.S., but she knew other family members "were getting a different version of her tha[n the daughter] was getting."

### (c) M.S.' Testimony

M.S. testified that she had previously worked as a law enforcement officer for about 21 years and was able to maintain housing and transportation with her income.

M.S. testified that she recognized she had a mental illness and that she needed to take medication. M.S. recounted that she was taking her medication as directed by Kauzlarich until January 2024 but stopped due to issues with her insurance. M.S. further testified that she intended to continue seeing a psychiatrist and a therapist. Although M.S. opposed mental health commitment and forced medication, she stated that she agreed with the form of treatment recommended by Kauzlarich's treatment plan and that she had been taking medication as prescribed since her most recent hospitalization.

M.S. testified that she had explored seeing a psychiatrist in her mental health facility other than Kauzlarich because she and Kauzlarich had "knocked heads" and because she believed Kauzlarich had provided her with "incorrect" information. As a result, she was contemplating a medical malpractice lawsuit. M.S. expressed discontent with the progress toward an

outpatient treatment plan. She had made three phone calls to outpatient psychiatrists, but they had waiting lists of approximately 8 months.

Regarding the events leading up to her most recent hospitalization, M.S. denied ever threatening herself or others with a firearm. M.S. testified that she was willing to sell her firearms because they were "causing a lot of turmoil and argument with my kids." When asked whether she intended to purchase a firearm in the future, M.S. responded, "Not—well, at this point, no. That's all I can answer. At this point, no."

### 4. Board Orders Commitment and Forced Medication

After deliberating, the Board found by clear and convincing evidence that the allegations in the petition were true. It determined that M.S. was suffering from a mental illness—bipolar I manic with psychosis. The Board further found that M.S. was a danger to herself and others and was unable to care for her basic human needs, such as essential medical care. It determined there was a history of noncompliance with taking anti-psychotic medications and a history of owning firearms, putting M.S. and her family in danger. The Board determined the treatment plan received in evidence was the least restrictive treatment and authorized forced medication.

### 5. M.S. Appeals; District Court Affirms Board

M.S. appealed to the district court. She argued that the Board violated her rights to confrontation and admitted inadmissible hearsay. She also contended that the evidence was insufficient to support committing her. The parties agreed that the matter was not moot because M.S. remained under commitment of the Board. The district court took judicial notice of the Board's transcript and bill of exceptions and received both into evidence. In a written order, the district court affirmed the Board's decision.

The district court was unpersuaded by M.S.' contention that the Board had violated her rights to confrontation set forth in § 71-954. It reasoned that the statements M.S. identified were for medical diagnosis and treatment, not testimonial statements—statements intended for later use at trial—subject to confrontation. The district court did agree that Kauzlarich's testimony about information relayed to him by M.S.' family was inadmissible hearsay and that the Board erred in allowing Kauzlarich to read testing results into evidence that indicated M.S. was masking her symptoms, but it found that these errors were harmless because the facts they elicited were also in the daughter's testimony. In its de novo review, the district court found clear and convincing evidence to support the statutory prerequisites for mental health commitment.

## II. ASSIGNMENTS OF ERROR

On appeal to this court, M.S. assigns that the district court erred in (1) finding that the Board did not violate her right to confront and cross-examine adverse witnesses; (2) finding the Board's admission and reliance on inadmissible hearsay was harmless error; (3) finding clear and convincing evidence to support a diagnosis of bipolar I disorder, manic with psychosis, pursuant to § 71-907; (4) finding there was clear and convincing evidence that M.S. presented a substantial risk of serious harm to herself or others within the near future pursuant to § 71-908; (5) finding there was clear and convincing evidence that the treatment plan proposed was the least restrictive alternative pursuant to § 71-925(1); (6) finding that the Board had considered all treatment alternatives before ordering inpatient hospitalization pursuant to § 71-925(6); and (7) finding there was clear and convincing evidence that forced medication was appropriate and that no lesser alternative would suffice.

## III. STANDARD OF REVIEW

[1] The district court reviews the determination of a mental health board de novo on the record. *In re Interest of S.J.*,

283 Neb. 507, 810 N.W.2d 720 (2012). In reviewing a district court's judgment, an appellate court will affirm unless it finds, as a matter of law, that clear and convincing evidence does not support the judgment. *Id.*

Clear and convincing evidence means the amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved; clear and convincing evidence is more than a preponderance of the evidence, but less than proof beyond a reasonable doubt. *Benjamin S. v. Crystal S.*, 313 Neb. 799, 986 N.W.2d 492 (2023).

[2] Whether a decision conforms to law and the interpretation of statutes present questions of law, in connection with which an appellate court reaches a conclusion independent of that reached by the lower court. *In re Interest of T.W.*, 314 Neb. 475, 991 N.W.2d 280 (2023).

[3] When judicial discretion is not a factor, whether the underlying facts satisfy the legal rules governing the admissibility of a proponent's evidence is a question of law, subject to de novo review. *State v. Boswell*, 316 Neb. 542, 5 N.W.3d 747 (2024).

## IV. ANALYSIS

### 1. Continuance Hearing: Confrontation

M.S. contends that her rights to confrontation pursuant to § 71-954 were violated at the hearing on her motion to continue because she was not given the opportunity to cross-examine Kauzlarich. We disagree.

At the time of the Board's hearings in this matter, § 71-954 provided:

> A subject shall have the right at a hearing held under the Nebraska Mental Health Commitment Act . . . to confront and cross-examine adverse witnesses and evidence equivalent to the rights of confrontation granted by Amendments VI and XIV of the United States Constitution and Article I, section 11, of the Constitution of Nebraska.

See, also, 2025 Neb. Laws, L.B. 150, § 118 (operative September 3, 2025; amending § 71-954 to allow mental health board to conduct hearings using videoconferencing). The Sixth Amendment to the U.S. Constitution states that "the accused shall enjoy the right . . . to be confronted with the witnesses against him." Similarly, Neb. Const. art. I, § 11, provides that "the accused shall have the right . . . to meet the witnesses against him face to face." We have held that the analysis under article I, § 11, is the same as that under the Sixth Amendment to the U.S. Constitution. *State v. Smith*, 286 Neb. 856, 839 N.W.2d 333 (2013). See, also, *In re Interest of S.B.*, 263 Neb. 175, 639 N.W.2d 78 (2002).

The rights to confrontation conferred by the U.S. and Nebraska Constitutions typically apply "[i]n all criminal prosecutions." See, U.S. Const. amend. VI; Neb. Const. art. I, § 11. But the language of § 71-954 extends "equivalent" rights to subjects of "hearing[s] held under the Nebraska Mental Health Commitment Act." Indeed, in the past, we have applied the language of § 71-954 to a commitment hearing, that is, a hearing held to determine whether there is clear and convincing evidence that the subject is mentally ill and dangerous as alleged in the petition. See *In re Interest of S.B., supra* (determining that same language, then codified in Neb. Rev. Stat. § 83-1058 (Cum. Supp. 2000), applied to place limits on telephonic testimony at mental health commitment hearing). M.S. posits the rights to confrontation in § 71-954 applied to the hearing on her motion to continue. They do not.

[4,5] In *State v. Daly*, 278 Neb. 903, 923, 775 N.W.2d 47, 65 (2009), the appellant argued that he had been deprived of his rights to confrontation at the "*Daubert/Schafersman* hearing" that preceded his criminal trial. Although he did not object on those grounds, we observed that "it is well established that Confrontation Clause rights are trial rights that do not extend to pretrial hearings in state proceedings." *Daly*, 278 Neb. at 924, 775 N.W.2d at 66, citing *Kentucky v. Stincer*, 482 U.S. 730, 107 S. Ct. 2658, 96 L. Ed. 2d 631

(1987); *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987); *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). See, also, *State v. McMillion*, 23 Neb. App. 687, 875 N.W.2d 877 (2016) (rejecting criminal defendant's argument on appeal that confrontation rights applied at pretrial hearing on motion in limine). Section 71-954 grants confrontation rights in mental health commitment proceedings "equivalent" to those in criminal cases. Accordingly, we conclude that the confrontation rights set forth in § 71-954 are trial rights that do not extend to pretrial hearings in mental health commitment proceedings. Because those confrontation rights do not extend to pretrial hearings, they did not apply to the hearing on the motion to continue in this case.

Although we conclude that M.S.' rights under § 71-954 were not violated at the hearing on the motion to continue, we express no view on whether the Board's decision to allow only the State to call and question witnesses for purposes of that motion was otherwise proper. We likewise do not address M.S.' argument that there was a violation of procedural due process when the Board's chairperson effectively ruled on M.S.' motion to continue without a majority vote of the Board members present. Although mentioned in her brief, M.S. did not assign this as error. See *State v. Price, ante* p. 1, 26 N.W.3d 70 (2025) (absent plain error, appellate court considers only those claimed errors both specifically assigned and specifically argued).

### 2. Commitment Hearing: Confrontation and Evidentiary Issues

We next address alleged errors concerning testimony at the commitment hearing. Again, M.S. claims that her rights to confrontation were violated, this time related to Kauzlarich's testimony about psychological testing conducted by Gillespie and about information relayed to him by M.S.' family. M.S. also argues that portions of Kauzlarich's testimony regarding

testing by Gillespie and statements by M.S.' family were inadmissible hearsay. Certainly, rights to confrontation and the rules of evidence apply to commitment hearings under the Nebraska Mental Health Commitment Act. See, § 71-954 (subject of petition under act shall have rights to confrontation equivalent to those granted by U.S. and Nebraska Constitutions); § 71-955 (rules of evidence apply at all hearings under act; no evidence will be considered that is inadmissible in criminal proceedings). But as we will explain, we are not convinced that those principles dictate reversal here.

(a) Psychological Testing Conducted by Gillespie

As recounted above, Kauzlarich testified at the commitment hearing that Gillespie performed psychological testing on M.S. When Kauzlarich was asked to state the results of the testing, M.S. unsuccessfully objected on confrontation and hearsay grounds. Kauzlarich then testified about the results. According to Kauzlarich, they indicated that M.S. can "present very well while still being very ill" and that she "had significant difficulty admitting to minor faults or foibles. Let alone acknowledging symptoms of significant impairment." Kauzlarich also testified that the "[v]ery high levels of intentional defensiveness and denial" made "a firm diagnostic conclusion impossible given these particular results."

In this appeal, M.S. concedes that Kauzlarich could use the psychological testing to form his own opinion. She claims, however, that her objection to Kauzlarich's testimony about the test results ought to have been sustained on confrontation and hearsay grounds. But whether M.S. is correct on this point is immaterial: Even if the Board should have excluded the testimony above, any such error was harmless.

We have applied the harmless error doctrine in criminal cases involving the violation of the right to confrontation and in criminal and civil cases involving evidentiary errors. See, e.g., *State v. Smith*, 302 Neb. 154, 922 N.W.2d 444 (2019); *State v. Grant*, 293 Neb. 163, 876 N.W.2d 639 (2016);

*Worth v. Kolbeck*, 273 Neb. 163, 728 N.W.2d 282 (2007). Although mental health commitments are civil proceedings, some criminal principles apply in such proceedings. As we have discussed, in mental health commitment hearings, § 71-954 incorporates the confrontation rights typically available to criminal defendants. And we have observed that the standard of review in mental health commitment proceedings was borrowed from criminal cases and adjusted from beyond a reasonable doubt to clear and convincing evidence. See *In re Interest of T.W.*, 314 Neb. 475, 991 N.W.2d 280 (2023). But whether a matter is civil or criminal, one means of showing harmless error is the same: If the disputed evidence is cumulative, any error in admitting evidence is harmless, whether of constitutional magnitude or not. See, e.g., *Worth v. Kolbeck, supra* (erroneous admission of evidence is harmless error and does not require reversal if evidence is cumulative and other relevant evidence, properly admitted, supports finding by trier of fact); *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990) (error in admitting or excluding evidence, whether of constitutional magnitude or not, is harmless if evidence is cumulative and there is other competent evidence to support conviction).

Here, M.S. cannot prevail because Kauzlarich's testimony about Gillespie's test results was cumulative of other evidence. Before the testimony to which M.S. objected, Kauzlarich testified without objection that because he thought M.S. "may have some doubts that she even has these problems," his team did objective testing. Kauzlarich went on, "[W]e did the psychological testing, which confirms that [M.S.] is good at covering up. [She] did what we call 'fake good.'" Similarly, Kauzlarich's testimony demonstrated that there was a contrast between how M.S.' family perceived her and how she presented to Kauzlarich. Like the testimony to which M.S. objected, this testimony conveyed that M.S. could cover up the symptoms of her mental illness. Accordingly, we conclude that any erroneous admission of testimony about the

results of psychological testing conducted by Gillespie was harmless error.

### (b) Information Relayed by M.S.' Family

M.S. also contends that Kauzlarich's testimony about information her family provided violated her rights to confrontation and was inadmissible hearsay. M.S. specifically cites Kauzlarich's testimony that the family members expressed concerns about her behavior, which had become more isolative and more paranoid, and that they felt fearful of her, as well as his testimony recounting the facts of the petition as set forth in the intake information provided by M.S.' daughter. The district court admitted this testimony over M.S.' hearsay objection.

Regarding confrontation, M.S. did not object to Kauzlarich's testimony on that basis; she objected based on hearsay. Although confrontation and hearsay analyses overlap, they are not the same, and preserving one issue will not preserve the other. See *State v. Britt*, 283 Neb. 600, 813 N.W.2d 434 (2012). Because M.S. did not object to the testimony about the family's input on confrontation grounds, she did not preserve that issue for our review. See *State v. Childs*, 309 Neb. 427, 960 N.W.2d 585 (2021) (objection, based on specific ground and properly overruled, does not preserve question for appellate review on any other ground).

[6] As to M.S.' hearsay objection, we find the Board did not err in overruling it. A declarant's out-of-court statement offered for the truth of the matter asserted is inadmissible unless it falls within a definitional exclusion or statutory exception. *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022). Neb. Rev. Stat. § 27-803(4) (Cum. Supp. 2024) sets forth an exception, regardless of the availability of the declarant, for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably

pertinent to diagnosis or treatment." We have referred to this as the medical purpose exception. See, e.g., *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020); *State v. Mora*, 298 Neb. 185, 903 N.W.2d 244 (2017). We have applied this hearsay exception to statements made for purposes of obtaining a mental health diagnosis or mental health treatment. See *Tilson v. Tilson, supra*.

M.S. argues that the medical purpose exception does not apply to the hearsay statements in this case because the declarants were her family members, who were not patients of Kauzlarich's. To be sure, we have observed that the hearsay exception for statements made for the purpose of medical diagnosis or treatment is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment. See *id*. But we have also recognized that this hearsay exception is broader than patient-physician communications. See *Vacanti v. Master Electronics Corp.*, 245 Neb. 586, 514 N.W.2d 319 (1994).

In fact, we have specifically held that the fact that the declarant is a family member of the patient does not preclude admissibility under the medical purpose exception,

> as long as the evidence satisfactorily demonstrates that the circumstances under which the statements were made were such that the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment, that the declarant's statements were reasonably pertinent to such diagnosis or treatment, and further, that a doctor would reasonably rely on such statements.

*In re Interest of B.R. et al.*, 270 Neb. 685, 691, 708 N.W.2d 586, 591 (2005). See, also, *State v. Swartz*, 318 Neb. 553, 17 N.W.3d 174 (2025) (applying language of § 27-803(4), then codified as § 27-803(3), see 2021 Neb. Laws, L.B. 57, § 1 (effective August 28, 2021)). And the fundamental inquiry under the language of § 27-803(4), when considering the

appropriate state of mind of the declarant, may be reasonably inferred from the circumstances; this determination is necessarily fact specific. See *State v. Swartz, supra*.

Considering the circumstances here, we conclude that Kauzlarich's testimony regarding statements by M.S.' family was admissible under the medical purpose exception to the hearsay rule. Kauzlarich testified that when he evaluated M.S. in 2024, he spoke to her family members and relied on the information they provided to diagnose and treat M.S. He testified that the information the family provided was important because he could not always obtain accurate facts from a client who is psychotic or guarded, and family members would have valuable insights from more time spent with the client, relative to Kauzlarich. These facts demonstrate that the family members' purpose in making the statements was to assist Kauzlarich in providing medical diagnosis and treatment. Their input that M.S. seemed paranoid and isolative was pertinent to diagnosing her and treating her because, at that time, she had a diagnosis of major depressive disorder with psychotic features and because the information in the petition suggested that M.S. was acting on thoughts that did not align with reality. Because the family members spent more time with M.S. than Kauzlarich did, it was reasonable for him to rely on their statements. Given all this, Kauzlarich's testimony about the family members' statements was not inadmissible hearsay.

### 3. Sufficiency of Evidence

In addition to the confrontation and hearsay arguments addressed above, M.S. asserts that the evidence was insufficient to support the Board's mental health commitment order. Section 71-925 sets forth the State's burden of proof when it seeks a commitment and addresses the appropriate treatment:

(1) The state has the burden to prove by clear and convincing evidence that (a) the subject is mentally ill and dangerous and (b) neither voluntary hospitalization

nor other treatment alternatives less restrictive of the subject's liberty than inpatient or outpatient treatment ordered by the mental health board are available or would suffice to prevent the harm described in section 71-908.

. . . .

(6) A treatment order by the mental health board under this section shall represent the appropriate available treatment alternative that imposes the least possible restraint upon the liberty of the subject. The board shall consider all treatment alternatives, including any treatment program or conditions suggested by the subject, the subject's counsel, or other interested person. Inpatient hospitalization or custody shall only be considered as a treatment alternative of last resort.

M.S. specifically assigns that there was not clear and convincing evidence to support a diagnosis of bipolar I disorder, manic with psychosis, or to support a finding that she was dangerous, as that term is defined by statute. She also assigns that there was not clear and convincing evidence that commitment was the least restrictive treatment of all treatment alternatives, the Board had considered all treatment options, and no lesser alternatives than forced medication would suffice.

Before addressing these issues, we reprise the governing standards of review. The district court reviews the determination of a mental health board de novo on the record. *In re Interest of S.J.*, 283 Neb. 507, 810 N.W.2d 720 (2012). In reviewing a district court's judgment, however, our review is deferential—we will affirm unless we find, as a matter of law, that clear and convincing evidence does not support the judgment. See *id.* As we have observed, our standard of review for mental health commitment cases was borrowed from the standard of review in criminal cases but adjusted to a lower quantum of proof, from beyond a reasonable doubt to clear and convincing evidence. See *In re Interest of T.W.*, 314 Neb. 475, 991 N.W.2d 280 (2023). In a criminal case, the relevant question in a sufficiency of the evidence review is whether, after

viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. See, e.g., *State v. Falcon*, 319 Neb. 911, 25 N.W.3d 462 (2025). In this case, the relevant question for M.S.' challenges to the sufficiency of the evidence is thus whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found there was clear and convincing evidence of the statutory prerequisites for commitment.

Analyzing the sufficiency of the evidence under this standard of review, we determine that we must affirm. The district court, in its de novo review, found that the State had presented the elements necessary for commitment, and we cannot say, as a matter of law, that clear and convincing evidence does not support that judgment.

### (a) Mental Illness Diagnosis

For a subject to be committed, § 71-925(1) requires the State to show, among other things, that he or she is mentally ill. Section 71-907 defines "[m]entally ill" as "having a psychiatric disorder that involves a severe or substantial impairment of a person's thought processes, sensory input, mood balance, memory, or ability to reason which substantially interferes with such person's ability to meet the ordinary demands of living or interferes with the safety or well-being of others." Here, Kauzlarich testified that M.S. was diagnosed with bipolar I disorder, manic episode with psychotic features, and his treatment plan identified a diagnosis of bipolar I disorder, manic with psychosis. M.S. does not dispute that this diagnosis meets the foregoing definition of mental illness, and she concedes that she has a mental illness of some kind. Yet, M.S. assigns that Kauzlarich's testimony was not clear and convincing evidence to support his diagnosis. M.S. does not claim any inconsistency between Kauzlarich's testimony and the diagnosis he named in the treatment plan. But, according to her, the diagnosis was based on a brief evaluation and

there were no specific observations in the record to support it. We disagree.

As a mental health professional, Kauzlarich was competent to testify about M.S.' condition. See *In re Interest of Tweedy*, 241 Neb. 348, 488 N.W.2d 528 (1992). See, also, § 71-906 (defining mental health professional). M.S. is essentially asking us to second-guess Kauzlarich's diagnosis, but that is not the province of this court. See *Morris v. Dall, ante* p. 122, 26 N.W.3d 304 (2025) (credibility of witness is question for trier of fact, which can credit or reject testimony in whole or in part). We conclude that Kauzlarich's testimony and his treatment plan that was received in evidence would allow a rational trier of fact to find that M.S. was mentally ill. M.S.' argument is not a basis for reversal.

(b) Mentally Ill and Dangerous

M.S. next challenges the Board's finding that the State had made the required showing that she is "mentally ill and dangerous," under § 71-925(1), as that phrase is defined by statute. Section 71-908 provides:

Mentally ill and dangerous person means a person who is mentally ill . . . and because of such mental illness . . . presents:

(1) A substantial risk of serious harm to another person or persons within the near future as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm; or

(2) A substantial risk of serious harm to himself or herself within the near future as manifested by evidence of recent attempts at, or threats of, suicide or serious bodily harm or evidence of inability to provide for his or her basic human needs, including food, clothing, shelter, essential medical care, or personal safety.

Again, M.S. does not deny that if the evidence supported the diagnosis of bipolar I disorder, manic with psychosis, she was mentally ill for commitment purposes. But she posits

she was not "mentally ill and dangerous" by claiming there was not clear and convincing evidence that she presented a substantial risk of serious harm to herself or others within the near future pursuant to § 71-908. This assignment of error lacks merit.

We read § 71-908 to provide two alternative grounds to find a person mentally ill and dangerous: subsection (1) "or" subsection (2). See *Mann v. Mann*, 316 Neb. 910, 7 N.W.3d 845 (2024) (word "or" used in statute is disjunctive). In this case, we understand the district court to have determined that M.S. was mentally ill and dangerous under both subsections; it emphasized Kauzlarich's testimony that absent medication, M.S. was a risk to herself and others. But we need not mirror that finding to affirm the district court's judgment. Our standard of review directs us to affirm the district court's determination if we find, as a matter of law, that clear and convincing evidence supports the judgment of commitment. See *In re Interest of S.J.*, 283 Neb. 507, 810 N.W.2d 720 (2012). Our review of the record leads us to affirm the district court's determination that M.S. is mentally ill and dangerous because we discern clear and convincing evidence demonstrating the conditions set out in subsection (1) of § 71-908.

Subsection (1) of § 71-908 can be satisfied in more than one way. It provides that a substantial risk of serious harm to another person or persons within the near future may be demonstrated "by evidence of recent violent acts or threats of violence" or "by placing others in reasonable fear" of serious harm to a person or persons. If a person's actions stemming from a mental illness place others in reasonable fear of harm, that is sufficient to show a person is mentally ill and dangerous.

In this case, the State presented evidence that because of M.S.' mental illness, she presented a "substantial risk of serious harm to another person or persons within the near future as manifested . . . by placing others in reasonable fear of such harm." § 71-908(1). Kauzlarich's testimony indicated

that M.S.' mental illness caused her to behave in ways that placed others in reasonable fear of a substantial risk of serious harm.

Kauzlarich testified that M.S.' children expressed concerns that during the months preceding her most recent hospitalization, M.S. had become more isolative and more paranoid and they had become fearful of her. Kauzlarich also recounted the intake information in the petition—about 2 weeks before the hearing, M.S. had appeared at her daughter's home expressing concerns for her daughter's safety; she had said she had a gun; and even though the daughter assured M.S. she was fine, M.S. returned to her daughter's home, was kicking at the daughter's door, and made statements about an impending "big" event related to the FBI. Additionally, Kauzlarich testified that M.S.' son was concerned for his safety and that M.S. would retaliate. Kauzlarich also noted that the son mentioned M.S. had been paranoid for quite some time and was covering up her symptoms during the time Kauzlarich worked with her. Kauzlarich testified that in his opinion, M.S. could be a danger to herself and to others. He based this opinion on the incident of M.S.' bringing a gun to her daughter's home and on M.S.' failure to seek care when she "ended up more psychotic" after the cessation of medication and therapy.

Evidence provided through M.S.' daughter further supported a finding that behaviors arising out of M.S.' mental illness placed others in reasonable fear of a substantial risk of serious harm. The daughter testified that the May 2024 incident made her concerned about M.S.' safety and the safety of others, especially the daughter's neighbor, who M.S. believed had her children, and M.S.' son, who was "keeping" M.S.' guns from her. The Board also received the daughter's intake information in which she reported that M.S. seemed "out of touch with reality" and "unpredict[able]" and that the daughter was "very concerned [M.S.] has [a] gun while under this state" and "went as far as to kick at our back door." She requested that M.S. be admitted and evaluated "[f]or the safety of others."

[7,8] At the time of the hearing, M.S. was engaging in treatment, her condition had improved, and she expressed some willingness to sell her firearms. And we have said that in determining whether a person is dangerous, the focus must be on the person's condition at the time of the hearing. *In re Interest of O.S.*, 277 Neb. 577, 763 N.W.2d 723 (2009). However, actions and statements of a person alleged to be mentally ill and dangerous which occur before the hearing are probative of the subject's present mental condition. *Id*. For a past act to have evidentiary value, the past act must have some foundation for a prediction of future dangerousness, thus being probative of that issue. *Id.* In M.S.' case, the Board heard evidence tending to prove that M.S.' past actions showed she was mentally ill and dangerous at the time of the hearing.

Because we find that the evidence adduced would allow a rational trier of fact to conclude M.S. was mentally ill and dangerous as defined in § 71-908, we find no merit to this assignment of error.

### (c) Least Restrictive Alternative; All Treatment Alternatives Considered; No Lesser Alternative Sufficed

Finally, we address M.S.' last three assignments of error, all pertaining to whether the treatment plan ordered by the Board was the best fit for her situation. In commitment proceedings, the State has the burden to prove by clear and convincing evidence that there are no treatment alternatives less restrictive than inpatient or outpatient treatment to prevent the harm described in § 71-908. See § 71-925(1)(b). The Board's treatment order must represent the appropriate level of treatment that "imposes the least possible restraint upon the liberty of the subject." See § 71-925(6). The Board is required to consider all treatment alternatives, including those suggested by the subject and the subject's counsel, and "[i]npatient hospitalization . . . shall only be considered as a treatment alternative of last resort." *Id.*

M.S. assigns that the district court erred in finding the evidence sufficient to support the Board's ruling that inpatient hospitalization was the least restrictive alternative, in finding that the Board had considered all treatment options, and in finding that no lesser alternative than forced medication would suffice. She emphasizes evidence that she was voluntarily complying with the treatment plan at the time of the hearing, including injectable medication. According to M.S., this demonstrated that a commitment order was not necessary for her to engage in treatment. We are unpersuaded.

Although M.S. gave testimony tending to support her position that her voluntary compliance with treatment forecasted future voluntary compliance, Kauzlarich gave a conflicting opinion. Even though M.S. was voluntarily engaged in treatment at the time of the hearing, Kauzlarich recommended a treatment plan involving mandatory inpatient and outpatient treatment, with therapy and forced medication for psychosis in the form of a long-acting injectable medication. Kauzlarich testified that this treatment plan was the least restrictive option based on M.S.' history of missing scheduled appointments and discontinuing medication. After hearing the treatment alternatives advocated by M.S. and by Kauzlarich, the Board issued a commitment order aligned with Kauzlarich's recommended treatment plan. We conclude, as a matter of law, that clear and convincing evidence supports the Board's decision that Kauzlarich's treatment plan was the least restrictive alternative and that none of the assignments of error relating to the treatment plan have merit.

## V. CONCLUSION

For the reasons above, we conclude that the district court did not err, and we affirm the district court's order.

AFFIRMED.